UNITED STATES of America, Appellee,

v.

Daniel D. ROSTENKOWSKI, Appellant.

Nos. 94–3158, 94–3160.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 17, 1995.

Decided July 18, 1995.

**1294**

Dan K. Webb and Howard M. Pearl, Chicago, IL, argued the cause for appellant. With them on the briefs were Thomas M. Buchanan and R. Kenneth Mundy, Washington, DC.

John R. Fisher, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the briefs were Eric H. Holder, Jr., U.S. Atty., John M. Campbell, Roy W. McLeese, III, Thomas J. Motley, Larry R. Parkinson, Wendy L. Wysong, Randall D. Eliason, and Leslie A. Blackmon, Asst. U.S. Attys., Washington, DC.

Before EDWARDS, Chief Judge, BUCKLEY, and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

Daniel D. Rostenkowski, a former United States Congressman from Illinois, brings this interlocutory appeal of two district court orders that in effect allow the Government to proceed with his prosecution for misappropriation of congressional funds. In the first order, the district court held that Rostenkowski's indictment on its face violates neither the Speech or Debate Clause nor the Rulemaking Clause of the Constitution nor the doctrine of the separation of powers. In the second order, the court denied Rostenkowski's motions for *in camera* review of grand jury materials and for a review of the evidence to be presented against him at trial, both of which he argues are necessary to the full development of the constitutional issues he raises.

As to the first order: (1) in light of the Supreme Court's recent decision in *Hubbard v. United States*, —— U.S. ——, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), we decline to determine at this time the constitutionality of those counts of the indictment alleging violations of 18 U.S.C. § 1001, which counts we remand to the district court for the purpose of entertaining such motions as the parties may wish to make; (2) we hold that the remaining counts present no problem under the Speech or Debate Clause; but (3) we conclude that certain portions of those counts are non-justiciable under the doctrine of the separation of powers and the Rulemaking Clause. As to the second order: (1) we affirm the court's denial of Rostenkowski's motion for *in camera* review of the grand jury materials; but (2) we hold that we do not have jurisdiction at this juncture to review the district court's denial of Rostenkowski's evidentiary motion.

## I. BACKGROUND

On May 31, 1994 the grand jury returned an indictment alleging generally that Rostenkowski and others had "devised ... a scheme" to defraud the United States of its money, its property, and its right to Rostenkowski's "fair and honest services." Specifically, the indictment charges Rostenkowski with seventeen separate violations of six federal statutes—six of which are associated with the general scheme to defraud and eleven of which are each associated with one of four subsidiary "schemes" to misappropriate funds, as follows.

*The General Scheme to Defraud: Counts 1–6.* Counts One through Six of the indictment focus upon certain communications that Rostenkowski allegedly made in furtherance of the general scheme to defraud the United States and the United States House of Representatives. Counts One, Two, Three, and Five charge Rostenkowski with mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, & 2. Count Four charges Rostenkowski with wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, & 2. Count Six charges that Rostenkowski tampered with a government witness, in violation of 18 U.S.C. §§ 1512(b)(1) and (b)(2)(A). Specifically, Count Six alleges that

Rostenkowski attempted to persuade an employee of the House of Representatives not to tell the grand jury that he had been paid as a member of Rostenkowski's congressional office staff for performing personal services for the Congressman.

*The Congressional Payroll Scheme: Counts 7 and 8.* Rostenkowski, like every Member of the House, authorized payment of his staff out of his "Clerk Hire Allowance" by submitting the appropriate forms to the House Finance Office. The indictment alleges generally that Rostenkowski instructed certain members of his staff to cash their paychecks and to deposit the proceeds with Rostenkowski's office manager, who then "paid these individuals later, in cash and in substantially smaller dollar amounts than the checks themselves, as they performed services for ... Rostenkowski." Count Seven charges specifically that by submitting Payroll Certification Forms stating that certain employees did official work when in fact they performed services for Rostenkowski, his family, or his campaign, the Congressman concealed a material fact from the House Finance Office, in violation of 18 U.S.C. §§ 1001 & 2. Count Eight charges that by improperly using his Clerk Hire Allowance to pay employees for personal services rather than official work, Rostenkowski stole, embezzled, and converted funds of the United States, in violation of 18 U.S.C. §§ 641 & 2.

*The House Stationery Store Scheme: Counts 9 and 10.* As a Congressman, Rostenkowski could purchase office supplies for official use from the Office Supply Service of the House, commonly called the House Stationery Store, by charging those supplies to his "Official Expenses Allowance." If a particular item was not in stock, Rostenkowski could cause the Store to order that item by completing a "Special Order Request" form stating that the item was necessary for the conduct of official business. Although a Member of Congress could also purchase items for personal use from the Store, he was required to pay for such items (plus a 10% service charge) himself.

Count Nine alleges that by purchasing for personal use from the House Stationery Store more than $40,000 of goods—including crystal sculptures, wooden armchairs, and fine china—and representing that those goods were for official business, Rostenkowski concealed a material fact from the House Finance Office, in violation of 18 U.S.C. §§ 1001 & 2. Count Ten alleges that by using his Official Expenses Allowance to purchase items that were used by him, his family, or his friends, Rostenkowski embezzled and converted funds of the United States, in violation of 18 U.S.C. §§ 641 & 2.

*The House Post Office Scheme: Counts 11–14.* As a Member of Congress, Rostenkowski could use government funds to purchase postage stamps for use on official mail. He needed only to submit to the Office of the Postmaster of the U.S. House of Representatives a signed voucher representing that the stamps would be used for an official purpose. The amount of postage purchased would then be charged by the House Finance Office to Rostenkowski's Official Expenses Allowance. The indictment alleges generally that Rostenkowski submitted vouchers (or stamps that he had purchased with vouchers) to the House Post Office and received cash in return.

Count Eleven alleges that by covering up the fact that he received cash rather than postage stamps in exchange for the vouchers that he had submitted, Rostenkowski concealed a material fact, in violation of 18 U.S.C. §§ 1001 & 2. Count Twelve alleges that by submitting fraudulent vouchers in exchange for cash, Rostenkowski embezzled and converted funds of the United States, in violation of 18 U.S.C. §§ 641 & 2. Count Thirteen alleges that Rostenkowski conspired with then–House Postmaster Robert V. Rota to exchange vouchers for cash, in violation of 18 U.S.C. § 371. Count Fourteen alleges that Rostenkowski exchanged funds from both his campaign committee and his political action committee for cash from the House Post Office and then concealed this fact from the Federal Election Commission, in violation of 18 U.S.C. §§ 1001 & 2. More specifically, Count Fourteen alleges that Rostenkowski exchanged checks drawn upon the accounts of those committees for over $28,000 in cash; that those checks bore his notation indicating that they had been

used to purchase postage stamps; and that this notation caused those committees to submit inaccurate campaign expenditure reports to the FEC.

*The Vehicle Purchase Scheme: Counts 15–17.* A member of the House of Representatives may, by submitting a valid lease agreement to the House Finance Office, use funds from his Official Expenses Allowance to lease a motor vehicle to be used as a "mobile district office" for the conduct of official business. The indictment alleges generally that Rostenkowski bought vehicles for his personal use and, by submitting fraudulent lease agreements to the House Finance Office, caused $73,500 in funds of the United States to be paid to an auto dealership for their purchase.

Count Fifteen alleges that Rostenkowski made false statements, in violation of 18 U.S.C. §§ 1001 & 2, based upon the lease agreements that he submitted to the House Finance Office. Count Sixteen alleges that by using his Official Expenses Allowance both to purchase motor vehicles that he and his family used and to rent garage space for a van that he owned, Rostenkowski embezzled and converted funds of the United States, in violation of 18 U.S.C. §§ 641 & 2. Count Seventeen alleges that Rostenkowski spent $28,267 in funds from his campaign committee to purchase vehicles for his personal use; that he caused his campaign committee to represent to the FEC that those campaign funds had been used to rent vehicles for campaign purposes; and that he thereby concealed a material fact from the FEC, in violation of 18 U.S.C. §§ 1001 & 2.

\* \* \*

At issue in this appeal are three motions Rostenkowski filed in the district court. In the first, he moved to dismiss the indictment upon two independent grounds. He argued first that the indictment is, in its entirety and on its face, invalid under the Speech or Debate Clause of Article I, Section 6 of the United States Constitution; that clause provides that "for any Speech or Debate in either House, [a Member of Congress] shall not be questioned in any other place," and thus protects the Member from prosecution for his legislative acts. Rostenkowski also

argued that the prosecution of all of the counts of the indictment other than Count Six will depend upon judicial interpretation of the Rules and Regulations of the House of Representatives, and that those Rules and Regulations are non-justiciable under the doctrine of the separation of powers and the Rulemaking Clause of Article I, Section 5 of the Constitution, which provides that "Each House may determine the Rules of its Proceedings."

In the second motion, Rostenkowski sought *in camera* review of "all evidence presented to the grand jury." In the third motion, he requested a bill of particulars, the production of "constitutionally exculpatory information," and a pretrial hearing. He argued that those procedures are necessary to his ability fully to develop the constitutional arguments set out in his first motion.

The district court denied Rostenkowski's motion to dismiss in one order and his other two motions in a separate order. Rostenkowski appeals those decisions pursuant to 28 U.S.C. § 1291.

## II. JURISDICTION

We first examine the basis for our jurisdiction over this interlocutory appeal. Generally, the court of appeal has jurisdiction to review only a final judgment of the district court. *See* 28 U.S.C. § 1291. In *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), however, the Supreme Court "carved out a narrow exception to the normal application of the final judgment rule, which has come to be known as the collateral order doctrine." *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S.Ct. 1494, 1498, 103 L.Ed.2d 879 (1989). Under that doctrine, an interlocutory order of the district court may be appealed immediately if it: (1) "conclusively determine[s] the disputed question"; (2) "resolve[s] an important issue completely separate from the merits of the action"; and (3) would be "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978); *see Cohen,* 337 U.S. at 546–47, 69 S.Ct. at 1225–

26; *cf. In re Continental Inv. Corp.*, 637 F.2d 1, 6 (1st Cir.1980) ("the possibility of irreparable harm resulting from a delay in appellate review is the dispositive criterion of interlocutory appealability"). We now consider whether the orders appealed by Rostenkowski satisfy that three-part test for review pursuant to *Cohen.*

### A. The Order Denying the Motion to Dismiss

■ We clearly have jurisdiction to review the order of the district court denying Rostenkowski's motion to dismiss. Because the Speech or Debate Clause protects a Member of Congress "not only from the consequences of litigation's results but also from the burden of defending [himself]," *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967), post-trial review of an order denying a claim of immunity under that Clause is insufficient to vindicate the rights that the Clause is meant to protect, *see Midland Asphalt Corp.*, 489 U.S. at 800–01, 109 S.Ct. at 1499 ("deprivation of the right not to be tried satisfies the ... requirement of being effectively unreviewable on appeal from a final judgment"). For that reason, and because the order in question self-evidently satisfies the first two requirements of *Cohen,* it is subject to immediate appeal under the collateral order doctrine. *Helstoski v. Meanor*, 442 U.S. 500, 506–08, 99 S.Ct. 2445, 2448–49, 61 L.Ed.2d 30 (1979) (*Helstoski I* ); *see United States v. Durenberger*, 48 F.3d 1239, 1241–42 (D.C.Cir.1995). For similar reasons, an order denying a claim of immunity based upon the separation of powers doctrine is appealable as a collateral order. *See United States v. Rose*, 28 F.3d 181, 185 (D.C.Cir.1994) ("Like speech or debate immunity, separation of powers immunity should protect legislators from the burden of litigation and diversion from congressional duties"); *Durenberger*, 48 F.3d at 1242; *see also United States v. Myers*, 635 F.2d 932, 935–36 (2d Cir.1980).

### B. The Order Denying the Supplemental Motions

Our jurisdiction over Rostenkowski's challenge to the trial court's second order is not as clear. In that order the district court denied both Rostenkowski's motion for *in camera* review of the grand jury materials and his compound motion for a bill of particulars, the production of "constitutionally exculpatory information," and a pretrial hearing to review the evidence to be presented at trial. Rostenkowski now appeals the denial only of his requests for *in camera* review of the grand jury materials and for an evidentiary hearing. We address our jurisdiction over each of those two decisions separately, bearing in mind that the collateral order doctrine is to be applied "with the utmost strictness" in a criminal case. *Flanagan v. United States*, 465 U.S. 259, 265, 104 S.Ct. 1051, 1054–55, 79 L.Ed.2d 288 (1984).

#### 1. Review of the grand jury materials

■ The order denying Rostenkowski's motion to review the grand jury materials clearly satisfies the first two elements of the *Cohen* test: the decision "conclusively determines the disputed issue," which is collateral to the merits of the case, *i.e.,* to guilt or innocence. *See United States v. Deffenbaugh Industries, Inc.*, 957 F.2d 749, 754 (10th Cir. 1992) (first two *Cohen* elements met where district court denied defendant access to certain grand jury materials). Whether that decision is also effectively unreviewable on appeal from a final judgment depends upon whether an indictment would be deemed invalid solely because it was procured by the use of material protected by the Speech or Debate Clause. If so, then to delay review until after trial would be to deny the Congressman the protection from "the cost and inconvenience of litigation" to which he is entitled under that Clause. *Rose*, 28 F.3d at 185. We turn, therefore, to the question whether the protection of the Speech or Debate Clause extends beyond the face of the indictment to limit the materials that may lawfully be presented to a grand jury.

To repeat, Article I, Section 6 of the Constitution provides that "for any Speech or Debate in either House, [a Member of Congress] shall not be questioned in any other Place." The Speech or Debate Clause is designed to "prevent intimidation by the executive and accountability before a possibly

hostile judiciary," *United States v. Johnson*, 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1974), and to ensure "that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." *Powell v. McCormack*, 395 U.S. 486, 505, 89 S.Ct. 1944, 1955, 23 L.Ed.2d 491 (1969). In order fully to secure those purposes, it seems that a court may find it necessary, at least under some circumstances, to look beyond the face of an indictment and to examine the evidence presented to the grand jury. *See United States v. Dowdy*, 479 F.2d 213, 223 (4th Cir.1973) ("If the speech or debate clause ... is to be given meaning, the validity of an indictment must be determined in the context of the proof which is offered to sustain it, or in the context of facts adduced on a motion to dismiss it"). Otherwise, a prosecutor could with impunity procure an indictment by inflaming the grand jury against a Member upon the basis of his Speech or Debate, subject only to the necessity of avoiding any reference to the privileged material on the face of the indictment.

The suggestion that the protection of the Speech or Debate Clause extends to grand jury materials finds strong support in the decisions of several other circuits and less directly in one of our own precedents. In *Rose* we stated broadly that the use of protected testimony "as background material for a [civil] complaint would clearly violate the Speech or Debate Clause," 28 F.3d at 186; *a fortiori* it would violate the Clause to use such material in order to procure a criminal indictment. Meanwhile, the circuits that have focused their attention more precisely upon the use of Speech or Debate material before a grand jury are unanimous in their condemnation of the practice. *See United States v. Swindall*, 971 F.2d 1531, 1543 (11th Cir.1992) (indictment must be dismissed where decision to indict based upon submission of Speech or Debate material to grand jury); *United States v. Helstoski (Helstoski II)*, 635 F.2d 200, 204–06 (3d Cir.1980) (dismissing indictment based upon wholesale violation of Speech or Debate Clause before grand jury); *Dowdy*, 479 F.2d at 223 (4th Cir.1973) ("it may be necessary to go beyond

the indictment [in looking for Speech or Debate material] in order to obtain the full meaning of what appear facially to be perfectly proper allegations"); *see also United States v. Durenberger*, Crim.No. 3–93–65, 1993 WL 738477 at *3–4 (D.Minn.1993) (submission of any Speech or Debate material to grand jury requires dismissal of indictment). Both the purpose of the Speech or Debate Clause and all the most relevant decisions of the other circuits point forcefully to the conclusion that the Clause protects not only against the reference to Speech or Debate material on the face of the indictment but also against its use before the grand jury, at least under some circumstances.

As compelled as that conclusion may seem, the Government understandably contests it upon three separate grounds. First, the Government contends generally that "an indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits" and that the "validity of an indictment is not affected by the character of the evidence considered" by the grand jury, quoting respectively *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956), and *United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974). While we accept the validity of those propositions in general, of course, we do not think that they are applicable where they would undermine the important purposes served by the Speech or Debate Clause. Moreover, as one court has noted, it is significant that *Calandra* involved the use of evidence seized in violation of the Fourth Amendment rather than the use of Speech or Debate material:

> Under the Speech or Debate Clause ... the constitutional violation is the use of legislative acts against a legislator. Unlike a violation of the Fourth Amendment, which the *Calandra* court held to be a past abuse and thus the lawful basis for subsequent grand jury questioning, it is the very act of questioning that triggers the protections of the Speech or Debate Clause.

*In re Grand Jury Investigation*, 587 F.2d 589, 598 (3d Cir.1978). For the moment, we express no view upon the question of when

the presentation of Speech or Debate Clause material to a grand jury invalidates a facially valid indictment; we conclude only that at some point the presentation of such material requires the court to dismiss the resulting bill. Even the Government seems willing to concede that pervasive violations of the Speech or Debate Clause before the grand jury would invalidate the indictment; that said, we do not see how it can also maintain that we lack the jurisdiction necessary to protect a Member of Congress from having to stand trial because of something said or done in the course of speech or debate in the national legislature. Nor does our decision significantly threaten the "historical independence" of the grand jury. *See United States v. Williams,* 504 U.S. 36, 47–50, 112 S.Ct. 1735, 1742–44, 118 L.Ed.2d 352 (1992). Cases that implicate the Speech or Debate Clause are thankfully rare; to the extent that our decision will have any impact upon grand jury proceedings, it will be limited to those few proceedings in which grand jury secrecy must be reconciled with Speech or Debate immunity, which is, after all, also a value of constitutional dimension.

Next, the Government contends that the possibility that the submission of Speech or Debate material to a grand jury could invalidate an otherwise valid indictment is precluded by *United States v. Johnson,* 383 U.S. 169, 185, 86 S.Ct. 749, 757–58, 15 L.Ed.2d 681 (1969). In that case the Supreme Court, having determined that Speech or Debate material had been presented to the grand jury and introduced at trial, nonetheless merely reversed the appellant's conviction and remanded the matter for retrial with the privileged material expunged from the indictment. The Government argues from the terms of the remand in *Johnson* that the Court did not consider the grand jury proceedings relevant to its analysis under the Speech or Debate Clause. We disagree.

*Johnson* speaks only to the question of when a facially valid indictment must be set aside because Speech or Debate materials were put before the grand jury. The Court did not consider the violations that took place

in that case sufficient to invalidate the entire indictment; rather the Court was confident that its modification of the indictment cured any problem created by the use of Speech or Debate materials before the grand jury. *See id.* at 185, 86 S.Ct. at 757–58 ("With all references to [Speech or Debate material] eliminated, we think the Government should not be precluded from a new trial on this count, thus wholly purged of elements offensive to the Speech or Debate Clause"); *see also Helstoski II,* 635 F.2d at 204–05 (*Johnson* does not always limit court review to face of indictment). The Court in *Johnson* did not address the anterior question relevant to our jurisdictional analysis. Indeed, the Government admits as much when it allows as how the Supreme Court "has never squarely addressed the argument that ... presentation of Speech or Debate material to the grand jury invalidates the indictment."

Finally, the Government points to *United States v. Carney,* 665 F.2d 1064 (D.C.Cir. 1981), a two-page *per curiam* opinion, in which this court said that "only those parts of an indictment which are facially invalid should be dismissed on Speech or Debate Clause grounds," and held that a "ruling denying ... a motion to inspect grand jury minutes [for Speech and Debate material] is unappealable" prior to trial. *Id.* at 1065. We must agree with the Government that a decision here that grand jury materials are subject to the limitations of the Speech or Debate Clause would be inconsistent with *Carney.* We note also the conflict between *Carney* and our more recent decision in *Rose,* in which we undertook a close review of the testimony used in the preparation of a civil complaint. In order to resolve these conflicts, however, we think the better choice is to overrule *Carney.*[*] The simple fact is that the court in *Carney* announced its conclusion without offering a reason, and we are unable to imagine any consideration, other than those that the Government advances and we find wanting above, for adhering to that opinion. As we have seen, *Carney* failed adequately to secure for Members of Congress the full protection of the Speech or

---

* This holding has been considered and approved by the full court and thus constitutes the law of

the circuit. *See Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981).

Debate Clause; accordingly, it has not been regarded either by this circuit or by any other as an absolute bar to a court reviewing grand jury records for material protected by the Speech or Debate Clause.

■ In summary, for the purpose of our jurisdictional analysis, we conclude that at least under some circumstances the Speech or Debate Clause prohibits not only reference to protected material on the face of an indictment but also the use of that material before the grand jury. Because delaying until after trial the appeal of an order refusing to review grand jury materials for Speech or Debate material could expose a legislator to a prosecution based upon his legislative acts, we hold that the district court order denying Rostenkowski's motion satisfies the third requirement of *Cohen.* Accordingly, we have jurisdiction to hear Rostenkowski's interlocutory appeal of that order.

### 2. Evidentiary hearing

■ We turn now to the district court's denial of Rostenkowski's discovery motion. Rostenkowski argues that, insofar as the Government may present Speech or Debate material at trial, the district court's denial of his evidentiary motion fails fully to protect his rights under the Speech or Debate Clause in the same way as does the denial of his motion to review the grand jury materials.

The analogy is not convincing, however. Assuming that the indictment is untainted by the submission of Speech or Debate material to the grand jury, but that a preview of the evidence that the Government proposes to present at trial would reveal some Speech or Debate material, it would still not be appropriate for the district court to dismiss the indictment; rather, the court would merely prohibit the Government from presenting that evidence at trial. Rostenkowski can obtain the same relief by objecting to the introduction of Speech or Debate material at such point(s) in the trial as the Government may propose to put protected material into evidence. *See United States v. Tom,* 787 F.2d 65, 68 (2d Cir.1986) (defendant is "not entitled to an interlocutory appeal to avoid ... having to defend against allegations made or evidence presented in connection with a count on which trial will in any event occur"). Because the district court can adequately protect the defendant against the admission of Speech or Debate material as the need arises in the course of trial, Rostenkowski's motion to review the Government's evidence prior to trial is not properly subject to interlocutory appeal. Hence, we reject his claim that "the government must specifically show before a trial its ability to omit all danger of implicating Speech or Debate materials"; prior to trial, the Government need show only that the indictment is valid under the Speech or Debate Clause—both on its face and, as we have held, in its provenance.

Rostenkowski also suggests an analogy to *Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1664–65, 32 L.Ed.2d 212 (1972), which provides that immunized testimony may not be used to support an indictment. Under *Kastigar* the Government must show that it has an independent (*i.e.,* non-immunized) source for all of the evidence that it plans to present at trial; in that legal setting, the need for a pre-trial hearing is quite compelling. Here, however, the Government does not have to establish an independent source for the information upon which it would prosecute a Member of Congress. Rather, the burden of proof is the other way round: the Member must show that the Government has relied upon privileged material. *See Government of the Virgin Islands v. Lee,* 775 F.2d 514, 524 (3d Cir.1985) ("burden of establishing the applicability of legislative immunity, by a preponderance of the evidence, rests with [legislator]").

Rostenkowski points out that some courts have indeed ordered a pre-trial evidentiary hearing in order to determine whether dismissal of a particular charge is required by the Speech or Debate Clause. *See McDade,* 28 F.3d at 298; *Lee,* 775 F.2d at 524–25. In those cases, however, a hearing was necessary only because the face of the indictment was insufficiently specific for the court to determine whether "any charge in the indictment ... [was] based on conduct that is protected by the Speech or Debate Clause."

*McDade*, 28 F.3d at 298; *Lee*, 775 F.2d at 524–25 (ordering hearing because court could not determine from face of indictment whether alleged acts are legislative). Therefore, the pre-trial hearings held in those cases are best understood as being in aid of a challenge to the facial validity of the indictment, and we will consider Rostenkowski's reliance upon those cases in the context of his motion to dismiss.

■ Finally, we decline to assert jurisdiction over the denial of Rostenkowski's motion for a pre-trial hearing upon the ground that it is pendant to the collateral orders over which we do have jurisdiction. In *Myers*, 635 F.2d at 936, the Second Circuit accepted pre-trial appellate jurisdiction of the defendant's claim that the indictment failed to state an offense, apparently upon the ground that the claim was pendant to an interlocutory appeal under the Speech or Debate Clause. As even the *Myers* court recognized, however, pendant appellate jurisdiction is generally unavailable, *see Abney v. United States*, 431 U.S. 651, 657 (1977); *McDade*, 28 F.3d at 288–89; indeed, it is particularly disfavored in the context of a criminal prosecution. *See Abney*, 431 U.S. at 657, 97 S.Ct. at 2039 ("the delays and disruptions attendant upon intermediate appeal . . . are especially inimical to the effective and fair administration of the criminal law"). The *Myers* court may be correct that because of the "small class of criminal cases brought against Members of Congress"— most of which involve pre-trial appeals under the Speech or Debate Clause—there would be "little [to] be lost in the way of judicial efficiency" if pendant jurisdiction were to be entertained, *Myers*, 635 F.2d at 936; but we do not see in that consoling thought any affirmative reason why a Member of Congress should be exempt from the rule against pendant appellate jurisdiction. As we have already explained, the district court is fully capable of protecting the Congressman against the admission into evidence of Speech or Debate material; to allow the appeal of an order denying wholesale review of the evidence *in limine* would needlessly delay the start of the trial with no discernable benefit.

In sum, we agree with the district court that, assuming that the indictment is valid on its face, the Speech or Debate Clause does not require pre-trial review of the evidence to be presented at trial. *See United States v. Rostenkowski*, Crim. No. 94–0226 (D.D.C. Oct. 14, 1994). The Government's use of Speech or Debate material in the course of a prosecution based upon a valid indictment implicates only the substantive protection of the Speech or Debate Clause against conviction, not its procedural protection against prosecution. Therefore, we hold that the district court's order denying Rostenkowski's discovery motion is not a collateral order subject to appellate review at this time.

### III. THE MERITS

■ Before addressing the merits of Rostenkowski's appeal, we note that since oral argument was had in this case the Supreme Court, in *Hubbard v. United States*, —— U.S. ——, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), has held that a false statement made to the Congress is not within the ambit of the statute prohibiting false statements to "any department or agency of the United States." 18 U.S.C. § 1001. *See Hubbard*, —— U.S. at ——, 115 S.Ct. at 1764 (*overruling United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955)); *see also United States v. Dean*, 55 F.3d 640, 658 (D.C.Cir. 1995) (*Hubbard* "narrowed the reach of § 1001 to matters within the executive branch"). Four counts of the present indictment (Seven, Nine, Eleven, and Fifteen) allege that Rostenkowski violated § 1001 when he made certain statements to the Congress; two other counts (Fourteen and Seventeen) allege violations of § 1001 that are predicated upon statements he allegedly made to the FEC. It appears that *Hubbard* may affect the status of all of the § 1001 counts, both those involving the Congress and, because of the uncertain status of the FEC at the time the statements were allegedly made, perhaps even the counts involving that body. *See Federal Election Commission v. NRA Political Victory Fund*, 6 F.3d 821, 823 (D.C.Cir. 1993) ("composition of the Commission" with both executive and legislative members "violates separation of powers"). Therefore, and because a "fundamental and longstanding

principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them," *Lyng v. Northwest Indian Cemetery Prot. Assn.,* 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988), we do not now review the district court's orders as they relate to those counts. Instead, we remand them to the district court to entertain such motions as the parties may make in light of *Hubbard* and to consider the relevance of that case in the first instance. Of course, if the district court determines that any of the § 1001 counts survives *Hubbard,* then Rostenkowski may file a new interlocutory appeal in order to determine whether the prosecution of those counts would violate the Speech or Debate Clause, the Rulemaking Clause, or the doctrine of the separation of powers.

### A. The Motion to Dismiss

Rostenkowski argues that his prosecution violates the Speech or Debate Clause, and that the indictment (other than Count Six, tampering with a witness) violates the doctrine of the separation of powers and the Rulemaking Clause. In this section, we consider those arguments only insofar as they are based upon the face of the indictment, and, of course, we do not consider the § 1001 counts at this time. Although we find no merit to Rostenkowski's claim under the Speech or Debate Clause, we hold that certain portions of his indictment are non-justiciable under the doctrine of the separation of powers and the Rulemaking Clause.

### 1. The Speech or Debate Clause

The Speech or Debate Clause, which is a Member of Congress's primary source of constitutional protection from criminal prosecution, protects the legislator from executive and judicial recrimination for his "legislative acts." *See, e.g., Johnson,* 383 U.S. at 185, 86 S.Ct. at 758. The Speech or Debate Clause protects more than just words spoken on the floor of the House, however; it extends to all matters that are "an integral part of the deliberative and communicative processes by which Members participate" in their constitutional duties. *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d

583 (1972) (committee reports protected); *see Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (committee hearings protected). Nevertheless, "the Court has been careful not to extend the scope of [the Speech or Debate Clause] further than its purposes require," *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 540, 98 L.Ed.2d 555 (1988). Hence, its "shield does not extend beyond what is necessary to preserve the integrity of the legislative process," *United States v. Brewster,* 408 U.S. 501, 517, 92 S.Ct. 2531, 2540, 33 L.Ed.2d 507 (1972), and it does not protect extra-legislative communications, such as newsletters or press releases. *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

▪ First, Rostenkowski argues that Count Eight, which charges that he used funds from his Clerk Hire Allowance to pay for personal services, runs afoul of the Speech or Debate Clause because it intrudes into his constitutionally protected discretion over staffing decisions and because its prosecution would "impede his ability to deliberate and communicate, and will thus impair the legislative process." The Government disputes those claims and also makes the broader argument that "in light of recent Supreme Court precedent ... personnel decisions are never protected by the Speech or Debate Clause."

This court has held that a staffing decision of a Member of Congress is protected by the Speech or Debate Clause only insofar as the employee's duties are "directly related to the due functioning of the legislative process." *Browning v. Clerk, House of Representatives,* 789 F.2d 923, 929 (1986) (discharge of Official Reporter protected under Speech or Debate Clause). *Browning* built upon our earlier decision in *Walker v. Jones,* 733 F.2d 923, 931 (1984), where we held that the Speech or Debate Clause did not protect the decision to discharge the general manager of the House of Representatives restaurant system, stating that:

> Auxiliary services attending to human needs or interests not peculiar to a Congress member's work qua legislator may advance a member's general welfare. To characterize personnel actions relating to

such services as "legislative" in character, however, is to stretch the meaning of that word beyond sensible proportion.

The Government contends that we must narrow the *Browning/Walker* standard for reviewing congressional staffing decisions in light of the Supreme Court's subsequent decision in *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), which holds that a judge's discharge of a probation officer is not a "judicial act" immune from suit under the common law. We decline the Government's invitation, however, because Rostenkowski's argument is unpersuasive even under the *Browning/Walker* standard.

The indictment specifically identifies several members of Rostenkowski's staff who allegedly performed personal services for him. There is no suggestion on the face of the indictment that any of those persons had any, even the most tangential, relationship to the "legislative process." Indeed, it would appear that their placement on his staff was a mere pretext for their payment out of congressional funds. At most, one might infer that some of them performed some "[a]uxiliary services ... not peculiar to [Rostenkowski's] work qua legislator." *Walker*, 733 F.2d at 931. In any event, Rostenkowski neither claims that he cannot determine who the employees are from the details to be found in the indictment nor argues that any of those employees was in fact involved in the legislative process. The Speech or Debate Clause presents no bar to the prosecution of Count Eight, therefore.

Second, Rostenkowski argues that the indictment improperly relies upon his status as a Member of Congress in order to prove his knowledge of House Rules, and thereby to establish that he knew that his use of congressional funds was unauthorized. He builds that claim upon a dictum in *United States v. Swindall*, 971 F.2d at 1543, that the Speech or Debate Clause "protects legislative status as well as legislative acts."

The *Swindall* court, however, considered only whether the Government may prove that a Member of Congress knew about a certain law by demonstrating his membership on a particular congressional committee. (The court ruled against the Government).

We do not understand that case to prohibit any and all mention of a Member's status as a legislator. *See McDade*, 28 F.3d at 291–94. It was well-settled before *Swindall* was decided that the Speech or Debate Clause does not prohibit proof of a defendant's status as a legislator, *see Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 and it has since been held that proof of a congressman's status as a member of a particular committee does not violate the Speech and Debate Clause. *See McDade*, 28 F.3d at 289–94.

■ Next, Rostenkowski argues that the indictment must be dismissed because his prosecution would require him "to offer proof of his legislative acts to defend himself." Rostenkowski points to nothing on the face of the indictment, however, to show that such a defense is necessary or that his legislative acts will ever be at issue in the trial. Moreover, to the extent that Rostenkowski himself chooses to present evidence of his status or activities as a legislator, we agree with the Second and Third Circuits that the constitutional protection against his being "questioned" for his legislative acts "does not prevent [a Member of Congress] from offering such acts in his own defense, even though he thereby subjects himself to cross-examination." *McDade*, 28 F.3d at 295; *see Myers*, 635 F.2d at 942.

Finally, Rostenkowski argues that the indictment is impermissibly vague, and "does not contain sufficient factual information for the court to determine whether dismissal of all or part of it is required under the Speech or Debate Clause." In this regard, he notes that the indictment does not define the type of "official" work performed by his staff and that it does not name the participants in the phone call alleged in Count Four. But this is hardly the type of vagueness that makes it impossible for us to determine whether "any charge in the indictment ... [was] based on conduct that is protected by the Speech or Debate Clause." *See McDade*, 28 F.3d at 298 (indictment not vague); *compare Lee*, 775 F.2d at 524–25 (indictment vague where it alleged that legislator went on "legislative fact-finding" trip without identifying which acts were not "legislative"). Moreover, the information Rostenkowski seeks should be

well-known to him, yet he makes no specific claim that either omission implicates a "legislative act." Nor does our independent review of the indictment reveal any other instance of vagueness suggesting a violation of the Speech or Debate Clause. Therefore, we find no merit in Rostenkowski's claim that the indictment is vague in any way that might raise a concern under the Speech or Debate Clause.

### 2. The separation of powers and the Rulemaking Clause

Rostenkowski next contends that the indictment is non-justiciable under the doctrine of the separation of powers and the Rulemaking Clause. His argument proceeds from *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), in which the Supreme Court considered the justiciability of claims potentially implicating the political question doctrine. After noting that the various formulations of the political question doctrine were "essentially a function of the separation of powers," the Court held that an issue is non-justiciable if "prominent on the surface" of that issue one finds:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710. Contending that all six of these factors are present in this case, *cf. Nixon v. United States*, —— U.S. ——, ——, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993) (different factors not "completely separate" from one another), Rostenkowski makes alternative arguments for dismissing the indictment under the doctrine of the separation of powers and the Rulemaking

Clause: (1) that the Rulemaking Clause is an absolute bar to judicial interpretation of the House Rules; and (2) that the particular Rules at issue in this case are ambiguous and, because there are "no judicially discoverable and manageable standards for resolving" those ambiguities, not subject to judicial interpretation.

#### a. The Rulemaking Clause as an absolute bar to judicial interpretation of the House Rules.

■ Rostenkowski argues that the Rulemaking Clause, which provides that "each House may determine the Rules of its proceedings," is a "textually demonstrable constitutional commitment" to the House of the power to interpret House Rules. Therefore, he contends, "absent a narrowly tailored statute empowering the executive branch to act, the Rulemaking Clause of the Constitution commits solely to the House the interpretation of its Rules and the decision whether to discipline a member for their violation." Pointing to laws that provide criminal sanctions applicable specifically to Members of Congress, *see, e.g.,* 2 U.S.C. § 437g (campaign financing requirements); 18 U.S.C. § 203 (bribery); 18 U.S.C. § 602 (solicitation of political contributions), Rostenkowski argues that in the absence of such a law, the executive and judicial branches may not "interfer[e] with the discretionary decisions of Congress," such as how to interpret House Rules.

Rostenkowski relies for this proposition principally upon *United States v. Eilberg*, 507 F.Supp. 267 (E.D.Penn.1980), in which the Government brought a civil action against a congressman for misrepresenting as "official" a number of toll telephone calls. The court noted that the Government had conceded in that case that "[e]nforcement of a purely internal House Rule by the executive and courts would be an encroachment on the powers of the House, a violation of the separation of powers, and a violation of the textual commitment [presumably the Rulemaking] clause." *Id.* at 276.

The Government's concession in the earlier case notwithstanding, *see United States v. Durenberger*, 48 F.3d 1239, 1245 n. 5

(D.C.Cir.1995) (*Eilberg* is inconsistent with law of this circuit), it is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules. *See Yellin v. United States,* 374 U.S. 109, 114, 83 S.Ct. 1828, 1832, 10 L.Ed.2d 778 (1963) ("It has long been settled ... that rules of Congress and its committees are judicially cognizable"). Rostenkowski's argument seems also to rest upon the mistaken premise that the Government seeks to impose criminal liability upon him for violating the House Rules themselves. That is not the case, however. The indictment alleges that he violated various federal laws of general application; in no count does it predicate criminal liability upon a nonstatutory violation. Therefore, Rostenkowski's reliance upon *Brown v. Hansen,* 973 F.2d 1118, 1122 (3d Cir.1992) (claim that Virgin Islands legislators violated internal rules of legislature, based solely upon those rules, held non-justiciable), is irrelevant, as is his observation that there is no federal common law of crimes, *see United States v. Hudson & Goodwin,* 11 U.S. 32 (7 Cranch 32), 3 L.Ed. 259 (1812).

At trial, the Government will almost certainly rely upon the House Rules in its effort to prove the statutory violations it has alleged. Often, in a prosecution for fraud or embezzlement, the Government must show that the defendant diverted the funds of an institution—such as his employer—from an authorized to an unauthorized purpose. In order to make that showing it is typically necessary to enter into evidence the institution's internal rules governing the expenditure of funds. *See, e.g., Carpenter v. United States,* 484 U.S. 19, 23–24, 27, 108 S.Ct. 316, 319–20, 321, 98 L.Ed.2d 275 (1987) (official policy and practice at newspaper used to prove misappropriation of prepublication information); *United States v. DeFries,* 43 F.3d 707, 708–09 (D.C.Cir.1995) (mail fraud may be determined from use of union ballots in violation of union by-laws). A congressman's prosecution for fraud and embezzlement of official funds is no different: in order to prove several of the counts against Rostenkowski, the Government must show that he diverted congressional funds from authorized to unauthorized purposes. As the

regulations governing the use of official funds by a congressman, the House Rules are necessary and proper evidence to make that showing. Indeed, if Rostenkowski's argument were accepted it would effectively insulate every Member of Congress from liability under certain criminal laws. Neither the Rulemaking Clause nor the doctrine of the separation of powers requires that result.

This conclusion is well-grounded in the case law of this circuit. In *United States v. Diggs,* 613 F.2d 988 (1979), a Congressman who greatly increased the salaries nominally paid to his staff out of the Clerk Hire Allowance and used the increases himself for personal expenses, and also paid members of his staff for performing personal services rather than official work, was convicted of mail fraud and of making false statements to the Congress. This court saw no problem in referring to the House Rules in order to determine whether Diggs's use of congressional funds was authorized. *See id.* at 994–96. Indeed, after finding that "no House regulation or order authorized" Diggs's use of the Clerk Hire Allowance, the court held that "[t]he legal standard is the law and rules Congress has passed." *Id.* at 996 n. 41. The court also rejected Diggs's argument that he had effectively been convicted for violating the House Rules: "The defendant clearly was tried not for violating the internal rules of the House of Representatives but for violating the mail fraud and false statements statutes." *Id.* at 1001.

We very recently revisited the question resolved in *Diggs* and confirmed the conclusion first reached there. Specifically, we rejected former Senator Durenberger's claim that his indictment for violating the general conspiracy statute, 18 U.S.C. § 371, should be dismissed because his prosecution would require reference to the Senate Rules. *See Durenberger,* 48 F.3d 1239. Any reference at trial to the Senate Rules would not change the fact that "Durenberger's prosecution is grounded in a substantive federal statute." *Id.* at 1245. We also interpreted the Senate Rules to "impose a duty of honesty and ... [to] operate on the assumption that [Senators] will not lie." *Id.* at 1244.

Rostenkowski would distinguish *Durenberger* on the ground that the standard stated in the Senate Rules implicated by that case could also be found in a statute, *see* 2 U.S.C. § 58(e), whereas the House Rules at issue here have no statutory counterpart. The purported distinction is surely irrelevant, however; in *Durenberger* the court did not find reference to the Senate Rules unobjectionable even in part because those Rules were mirrored in a federal statute. Moreover, Rostenkowski's distinction does not apply to *Diggs,* a case upon which the court expressly relied in *Durenberger. See id.* at 1245 & n. 5; *see also United States ex rel. Joseph v. Cannon,* 642 F.2d 1373 (D.C.Cir. 1981) (canvassing House Rules for standard by which to measure Member's allegedly illegal conduct).

Finally, we reject as overbroad Rostenkowski's contention that if a prosecution may in any way depend upon reference to the content of the House Rules then congressmen will "forego legitimate legislative action out of fear that judicial or executive interpretation of [the House] Rules will subject them to criminal liability." The Rules at issue in this trial have no direct connection to the legislative process—they govern only the internal payment of staff salaries and office expenses. Moreover, the Speech or Debate Clause adequately protects a legislator's "legitimate legislative action[s]." Our conclusion here merely requires Members of Congress to abide by certain laws (*e.g.,* against fraud and embezzlement) of general application.

### b. Are the House Rules involved in this case too vague for judicial interpretation?

Rostenkowski's second argument under the doctrine of the separation of powers is significantly less ambitious (and somewhat more successful) than his first. Here he contends not that the House Rules are completely off-limits to the judiciary, but instead that the Rules involved in this case do not provide a "judicially discoverable and manageable standard for" determining whether his use of congressional funds was unauthorized, so that the interpretation of those Rules at his trial would require a policy determination unfit for judicial discretion. The Government's response is two-fold. First, it argues that the Speech or Debate Clause is the only constitutional protection provided to a Member of Congress; hence, the doctrine of the separation of powers cannot bar the prosecution of a Congressman. Alternatively, the Government contends that the Rules at issue in this case are clear, or at least clear enough to allow the court to interpret and apply them without invading the province of the House.

■ We note first that we agree with the intuition behind Rostenkowski's argument: a sufficiently ambiguous House Rule is nonjusticiable. Of course, under Article III of the Constitution the courts are the final arbiters of the law and may not shirk their duty to interpret the law merely because it is ambiguous. *Marbury v. Madison,* 5 U.S. 137 (1 Cranch), 2 L.Ed. 60 (1803). At the same time, however, the Rulemaking Clause of Article I clearly reserves to each House of the Congress the authority to make its own rules, and judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution. *See Cannon,* 642 F.2d at 1385 ("In the absence of any discernible legal standard—or even of a congressional policy determination—that would aid consideration and decision of the question ... we are loathe to give the [statute] an interpretation that would require the judiciary to develop rules of behavior for the Legislative Branch"). If a particular House Rule is sufficiently clear that we can be confident of our interpretation, however, then that risk is acceptably low and preferable to the alternative risk that an ordinary crime will escape the reach of the law merely because the malefactor holds legislative office. *See Durenberger,* 48 F.3d at 1244 (court may interpret Senate's internal rules where it "requires no resolution of ambiguities"). Where, however, a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making

the Rules—a power that the Rulemaking Clause reserves to each House alone.

Therefore, we reject the Government's argument that the Speech or Debate Clause stands as the only protection from prosecution that the Constitution provides to a Member of Congress. Though that Clause may be most directly concerned with the question, it does not supplant the doctrine of the separation of powers nor authorize a court to set to naught the allocation of authority in the Rulemaking Clause. Because we agree with Rostenkowski that for a court to interpret a House Rule in the absence of "judicially discoverable and manageable standards" would require the court to make "an initial policy determination of a kind clearly for nonjudicial discretion," and would run the risk of intrusion into the legislative sphere, we must review the individual counts charged in the indictment in order to determine whether the trial court will be required to interpret ambiguous House Rules.

*Counts One through Five.* These counts are associated with the broad scheme to defraud the United States, which overarches the four specific schemes involving the Clerk Hire Allowance, the House Stationery Store, the House Post Office, and the vehicle leases. In order to prove that Rostenkowski participated in the broad scheme, the Government must show that he participated in at least one of the four component schemes. Therefore, we shall delay our consideration of Counts One through Five until we have considered the other counts and thereby determined whether (or to what extent) any House Rule may be used to prove Counts One through Five.

*Count Eight.* Because Rostenkowski does not challenge Count Six as a violation of the separation of powers, we turn next to Count Eight. There it is alleged that Rostenkowski embezzled funds from the Clerk Hire Allowance and converted them to his own use, *viz.,* to pay members of his staff for the performance of personal services and not for the performance of official work. *See* 18 U.S.C. § 641.

Rostenkowski argues that in order to prove Count Eight, the Government must draw a line between "official work" and "personal services," and that this line can be drawn only by reference to ambiguous House Rules. He invokes two earlier decisions of this circuit in support. In *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373 (1981), the plaintiff brought a *qui tam* action under the False Claims Act, 31 U.S.C. § 231 (1976), alleging that Senator Cannon had paid a staff member for the performance of purportedly "official legislative and representational duties" when in fact the assistant was working "extensively and exclusively for the Senator's reelection." *Id.* at 1375. The court first noted that there was "no judicial decision or administrative ruling" to guide its inquiry into whether Cannon's use of congressional funds was authorized. After conducting a review of the relevant rules, regulations, and internal policies of the Senate, the court found that

> [T]here were ... no "manageable standards" for a court to apply when viewing staff participation in a Senate reelection campaign. Moreover, the inability of the Senate—a body constitutionally authorized and institutionally equipped to formulate national policies and internal rules of conduct—to solve the problem demonstrates "the impossibility of deciding" the issue appellant poses "without an initial policy determination of a kind clearly for nonjudicial discretion".

*Id.* at 1383–84. Concluding that the adjudication of the plaintiff's claim would require "the courts to monitor every action taken by a Senator and his aide in an effort to determine whether it is sufficiently 'official' or too 'political,'" the court dismissed the case. *Id.* at 1384.

In *Winpisinger v. Watson,* 628 F.2d 133 (1980), the plaintiffs argued that members of President Carter's cabinet were improperly "using the resources of the federal government [to] provide the Carter–Mondale Committee with federal support." *Id.* at 136. The court dismissed the plaintiffs' claim, holding that its resolution would require the court to determine whether executive actions were motivated by a genuine concern for the public interest or by "political expediency," and that this determination would impermis-

sibly intrude the judiciary into the affairs of a coordinate branch of government.

The Government essentially concedes the first part of Rostenkowski's argument, admitting in its brief that the "difference ... between official work and personal services ... is ... the key distinction in this prosecution." In the Government's view, however, the court is well-equipped to apply this distinction. Count Eight, we are told, is less like the claim in *Cannon* or *Winpisinger* than it is the claim in *Diggs* that the congressman had unlawfully used his Clerk Hire Allowance. Diggs argued that he had lawful authority to increase the salaries of his staff and to use that increase to pay official expenses. The court disagreed:

> The defendant's argument erroneously equates a congressman's discretion to define the duties of an employee with the unfettered power to divert monies intended for one purpose to another completely unauthorized purpose. ... [T]he allowance for clerk-hire and the allowance for district office expenses were separate and distinct. No House regulation or ordinance authorized the commingling of these funds, either directly, or as in this case, indirectly. Had Congress intended that the clerk-hire funds be used to pay expenses of the district office it could have so provided.

*Diggs*, 613 F.2d at 995–96 (emphases omitted). Diggs also argued that he had the discretion to employ staff members to render "concededly ... personal services," and therefore that his "failure to reveal the exact nature of [those] employees' responsibilities" to the House did not amount to the concealment of a material fact. *Id.* at 1002. The court rejected this argument as well: "The defendant's representations that ... [the employees] were *bona fide* congressional employees ... were fraudulent and material in violation of 18 U.S.C. § 1001". *Id.* at 1002.

The Government distinguishes *Cannon* on the ground that there was in that case a "complete absence" of standards to determine the key issue, namely whether campaign activity could be considered "official." *Cannon*, 642 F.2d at 1379. According to the Government, the court in *Cannon* was being

asked to draw a line between "official" work and "campaign-related" work although it was not clear that the Congress itself had recognized such a distinction. Here, in contrast, the House Rules assertedly make it clear that the House recognizes a line between "official" and "personal" work.

The Government documents its point as follows. First, 31 U.S.C. § 1301(a) requires generally that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." Next, the annual Legislative Branch Appropriations Acts authorize a specific level of funding "[f]or staff employed by each Member in the discharge of his official and representational duties." *See, e.g.,* 1991 Legislative Branch Appropriations Act, Public Law 101–520, 104 Stat. 2254 (1990). Finally, the law provides that "the Committee on House Administration may ... fix and adjust ... the amounts of allowances [for clerk hire] (including the terms, conditions, and other provisions pertaining to those allowances)," 2 U.S.C. § 57, which the Committee on House Administration did when it prohibited the personal use of funds from that allowance in the *Congressional Handbook.* The *Handbook* "provides in a single source the Regulations and Procedures for Allowances and Expenses for Members, Committees, and Employees of the House," U.S. House of Representatives, Comm. on House Administration, *Congressional Handbook,* at III (1985). The Government argues that the House Rules contained therein draw a clear line between "personal services" and "official work":

> The Clerk Hire Allowance is provided for the employment of staff in the Member's Washington D.C. congressional office and district office(s). ... [It] may not be used to defray any personal, political or campaign related expenses, nor expenses related to the conduct of committee business.

*Id.* at 2.1.

Thus, while Rostenkowski and the Government agree that the resolution of Count Eight requires the Court to draw a line between "official work" and "personal services," they disagree about whether we can

draw that line without interpreting ambiguous House Rules. Let us see.

First, although *Diggs, Cannon,* and *Winpisinger* are all relevant to our analysis of the question, we think that none of them is controlling. In *Diggs,* the court never had to determine whether the work performed by the employees was "official." Diggs's first argument was rejected because the phony salary increases were used to pay for office expenses, not because they were used to pay for services that were not "official." Nor did the court need to distinguish personal services from official work in order to reject his second argument: Diggs conceded that the services performed by the members of his staff were "personal" and therefore not "official"; hence, the only question before the court was the materiality of that fact.

Similarly, *Cannon* is not controlling because the court did not need to determine whether the particular activities alleged were "official" or "campaign-related" but only whether any congressional rule distinguished between "official work" and concededly "campaign-related" work. In Rostenkowski's case, we know from the Rule cited by the Government that the Congress has distinguished "personal" from "official" expenses; the harder question before us is whether those terms are sufficiently clear, either inherently or as interpreted by the House itself, that we may proceed to apply them to the facts alleged in the indictment. *Winpisinger* is unhelpful because there the court had no standard at all by which to decide whether the defendants' conduct was "official." Here, as the Government has shown, both the Appropriations Acts and the *Handbook* provide us with at least some guidance.

Whether we can discern a line between "official work" and "personal services" that is sufficiently clear to allow us to classify the activities of a congressman's staff is a question of first impression. The Government contends that the Appropriations Acts and the *Handbook* provide a "judicially discoverable and manageable standard[ ]" for resolving that question. We are not so sure. It is clear enough that the Congress has drawn a line between use of the Clerk Hire Allowance to employ staff assisting "in the discharge of official and representative duties" (permissible under the Annual Appropriations Acts) and use of that allowance "to defray personal, political or campaign related allowances" (prohibited by 2 U.S.C. § 57; 31 U.S.C. § 1301; and the *Handbook* ). Precisely where the Congress drew that line—essentially the line between "official work" and "personal services"—is not so clear, however. The Government has pointed us to very little in the *Handbook* or elsewhere that would help us to determine whether the activities allegedly performed by Rostenkowski's staff were "official work" or "personal services." Moreover, as Rostenkowski notes, the House has not attempted to define a Member's "official and representative duties," and has in large measure vested Members with "discretion to fix the terms and conditions of employment" of staff members. *Handbook* at 2.3, 2.14. Without more guidance from the House, there may well be allegations as to which the court may not venture to interpret the terms "official" and "personal" without making an "initial policy determination of a kind clearly for nonjudicial discretion" or inviting the "embarrassment [of] multifarious pronouncements by various departments." *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710; *see also United States v. Eilberg,* 553 F.Supp. 1, 5 (D.D.C.1981) ("strictly official" standard clearly applicable to some congressional phone calls but not so clearly applicable to others).

We turn now to consider whether the activities allegedly performed by the staff members identified in Count Eight can clearly be classified as "personal services." (Although Count Eight does not itself detail the specific activities in question, the allegations of Count Eight relate back to the activities of the fourteen employees identified in Count Seven, the other Congressional Payroll Count). Because eight of those fourteen employees were no longer allegedly on the Congressional Payroll during the period covered by Count Eight (beginning "on or about December 1, 1988") we presume that the Government does not plan to prove Count Eight by proffering evidence relating to any but the six other identified employees; therefore,

we limit the scope of our analysis to the activities that they allegedly performed.

Where, after reviewing the alleged activity of a particular employee, we find that the Rules provide a "judicially discoverable and manageable" standard clearly indicating that the activity was a "personal service" (or was not "official work"), the allegation may stand and the Government may attempt to prove its case. Where, however, we conclude that the Rules do not provide a standard that is justiciable or the indictment is too vague to enable us to determine whether the alleged activity may clearly be labeled as a "personal service" under the Rules, the allegation is non-justiciable and Rostenkowski may not be tried upon that basis. In sum, unless we can determine that the facts set out in a particular allegation could not be authorized under any reasonable interpretation of the House Rules, we must find that allegation non-justiciable.

▆▆▆ (1) Employee Two is alleged to have performed "personal services" for Rostenkowski, "such as engraving gift items and mounting souvenirs on plaques." For our resolution of the latter allegation, the Government refers us only to § 2.I.A, the General Introduction to the *Handbook*, in which the distinction between "personal" and "official" is reflected but not explained. For all we can tell, "mounting souvenirs" might well be considered "official work"—much like decorating the office—in the context of an institution to which tens of thousands of visitors come every year, many of them stopping specifically to see their congressman's office.

For our resolution of the allegation that Employee Two "engrav[ed] gift items," however, the *Handbook* offers greater guidance, for it clearly prohibits (at § 2.III.F.10) the use of the Official Expenses Allowance to purchase gifts (except under certain circumstances). Insofar as the "gift items" allegedly engraved by Employee Two were (or were to be) given away by Rostenkowski as gifts (and do not come under the exceptions listed in § 2.III.F.10), we can be certain that the gifts themselves were personal rather than official, and that Employee Two's engraving of those items constituted "personal services." Therefore, only the allegation that

Employee Two performed "personal services" such as "engraving gift items" is justiciable.

▆▆▆ (2) Employees Eight, Ten, and Twelve are alleged to have performed "little or no official work in the congressional office." From this allegation it is not clear whether the Government means to show that these employees performed work but that the work they performed was not "official." Because the Government has not shown us that what "little" work they may have done was not "official," we must hold that the allegations relating to Employees Eight, Ten, and Twelve are non-justiciable except to the extent that the Government may prove that they did "no ... work at all."

▆▆▆ (3) Employee Eleven is alleged to have done "little or no official work" and to have "performed regular bookkeeping duties" for a private insurance company that Rostenkowski owned. No reasonable interpretation of "official work" performed by a congressional staffer could include the performance of bookkeeping work for a private company owned by a Congressman. Therefore, insofar as the Government seeks to show that Employee Eleven was paid from the Clerk Hire Allowance for the performance of such work, the House Rules are clear and no barrier to prosecution.

▆▆▆ (4) Employee Thirteen is alleged to have done "little or no official work" and to have performed "personal services for ... Rostenkowski, such as picking up his laundry, driving his family members around Washington, and working at campaign events." Because the performance of those activities might, in some circumstances, directly—even vitally—aid a Congressman in the performance of his official duties, we cannot say that the services allegedly performed by Employee Thirteen could not be considered "official" rather than "personal" under any reasonable interpretation of the House Rules. In addition, we cannot be confident, without more information, that the allegedly "campaign-related" activities were in fact "campaign-related" under the Rules. For these reasons, we hold that the allega-

tions relating to Employee Thirteen are non-justiciable.

■ *Count Ten.* Rostenkowski is charged with having embezzled and converted funds from the Official Expenses Allowance by:

> causing a variety of valuable consumer goods and gift merchandise obtained by him from the House Stationery Store, including armchairs, luggage, sets of china, and crystal sculptures of the U.S. Capitol ... to be paid for as supplies necessary for the official use, when in fact the goods he obtained were for the personal use of himself, his family, or his friends.

More specifically, the indictment alleges that Rostenkowski either kept these items for his personal use or "gave [them] as personal gifts to friends and associates." Like Count Eight, Count Ten requires the court to draw a line between "official" and "personal"—here, the line lies between "official use" and "personal use" rather than between "official work" and "personal services." Again, the Government contends that the House Rules provide a manageable standard.

The Government begins with an annual Legislative Appropriations Act, such as Public Law 101–520, 104 Stat. 2254 (1990), which provides funds "[f]or allowances and expenses as authorized by House resolution or law," and with three sections of the *Handbook.* First, the Government points us to § 2.I.A. of the *Handbook,* which states both that "[t]he Official Expenses Allowance is provided to pay ordinary and necessary business expenses incurred by the Member (and/or the Member's employees) ... in support of the Member's official and representational duties to the district from which he/she was elected," and that the allowance "may not be used to defray any personal political or campaign related expenses." Second, the Government refers us to § 2.III.C.5.a(6) of the *Handbook,* which provides that items ordered from the House Store "not for official use" should be identified and paid for (along with a service charge of 10%) from the Member's personal funds.

Once again it seems that while the House Rules certainly contemplate a line between the "official" and the "personal," they do little to indicate where that boundary lies. The third Regulation to which the Government points provides some guidance, however. Under the heading of "General Expenses and Procedures," § 2.III.F.10, the *Handbook* states:

> Expenses for gifts or donations of any type, except U.S. flags flown over the Capitol and items purchased for presentation when on official travel for the House of Representatives outside the U.S., its territories and possessions, *are not payable* from the Official Expenses Allowance.

(Emphasis in original). This statement could hardly be clearer: funds from the Official Expenses Allowance may not be used to purchase gifts except under certain clear and limited circumstances. Hence, the Government may prove Count Ten by showing that Rostenkowski purchased gifts outside the exception in the above-quoted provision with funds from his Official Expenses Allowance. To the extent, if any, that the Government's case depends upon showing that Rostenkowski purchased items for his "personal" use, however, Count Ten is non-justiciable; as we have already seen in our consideration of Count Eight, without explanation in the Rules that term is too ambiguous to support the prosecution of a Member of Congress.

■ *Counts Twelve and Thirteen.* The House Post Office Counts allege that Rostenkowski violated 18 U.S.C. §§ 641 & 2 ("willfully stole, embezzled, and converted to his own use ... funds of the United States") by submitting postage stamp vouchers to get cash. Essentially, the Government must show that the House Rules did not authorize the disbursement of cash from the Official Expenses Allowance in exchange for those vouchers. *Cf. United States v. Faust,* 850 F.2d 575, 580 (9th Cir.1988) (affirming conviction for embezzlement under § 641 where defendant, although ultimately entitled to the funds, "intentionally deprived the government of the rights of supervision and control upon which the government insisted"). That showing requires no interpretation of ambiguous House Rules: Section 2.III.F.16.d of the *Handbook* provides that a congressman may submit a voucher and receive "postage

or postage stamps for the mailing costs of official mail." Under no reasonable interpretation of that Rule (or of any other of which we are aware) would a congressman be authorized to submit a voucher for postage stamps and get cash in exchange.

■ *Count Sixteen.* In this count the Government alleges that Rostenkowski, through two schemes related to the leasing of vehicles for official use, embezzled congressional funds and converted them to his own use. In the first scheme alleged, Rostenkowski submitted fraudulent lease agreements, thereby causing the House Finance Office to make monthly payments from the Official Expenses Allowance to lease a mobile district office for Rostenkowski's official use when in fact "no vehicles were being leased at all, and the payments were being used to cover the cost of purchasing vehicles that were titled to, and owned by, Rostenkowski." In the second scheme alleged, Rostenkowski caused the House Finance Office to pay for garaging a vehicle he owned by representing that the vehicle was "leased by Congress" as a mobile district office for his use.

Adjudication of Count Sixteen requires no judicial interpretation of any House Rule at all. In order to prove Count Sixteen, the Government needs to show only that Rostenkowski purchased a vehicle (titled in his name) with funds authorized for leasing a vehicle; and that the garaged vehicle was owned by Rostenkowski rather than leased. A court is well able to discern the difference between "leasing" a vehicle and "purchasing" (or "owning") a vehicle, and there is no need to determine whether Rostenkowski used the purchased vehicles for "official" or for "personal" purposes. Rostenkowski has pointed us to no section of the House Rules that could be interpreted to authorize a Congressman to cause the Government to pay for his purchase of a vehicle (by falsely representing that he is leasing the vehicle, no less) for use as a mobile district office. So long as the Government does not try to show that the vehicles in question were used for "personal" rather than "official" purposes, the House Rules are no bar to the justiciability of Count Sixteen.

We recur now to Counts One through Five. Those counts are justiciable to the extent that they are consistent with the conclusions above: the Government may not prove those counts at trial by reference to any House Rule that we have determined is not subject to judicial interpretation. Otherwise, Counts One through Five are justiciable.

If we seem to have been overly cautious in our analysis or to have allowed that some activities that were most likely "personal" might have been "official" depending upon the circumstances, we have good reason. First, because the doctrine of the separation of powers lies at the very heart of our constitutional system, we must avoid interpreting the term "personal" any more broadly than necessary. If there can be a reasonable doubt about whether, assuming that the allegations of the indictment are true, a Member used congressional resources for his own benefit in violation of a House Rule, then the court cannot presume to interpret the rule.

Second, the life of a congressman—as incumbent legislator and perpetual candidate for office, whose official day ends only after a round of nominally "social" events at which he is obliged to appear, and whose weekends and holidays are only an opportunity to reconnect with his constituents—makes the line between "official work" and "personal services" particularly difficult to draw. Anticipating the point, the Government makes a rhetorical feint: "Ordinary people understand the difference between official duties and personal services...." That is, however, an invitation to "mobocracy," and after-the-fact mobocracy at that. For the "ordinary person," unlike a legislator, the distinction between work and life may be relatively clear. For a Congressman, it is not so clear; service in the United States Congress is not a job like any other, it is a constitutional role to be played upon a constitutional stage. Therefore, the Executive may not expect the Judiciary to resolve against a Member of Congress an ambiguity in the Rules by which the Legislature governs itself, if reason allows otherwise.

B. *In Camera* Review of Grand Jury Materials

 We determined above (in Part II.B.) that we have jurisdiction to hear Rostenkowski's interlocutory appeal of the district court's order denying his motion for *in camera* review of grand jury materials. We now consider the merits of that appeal, *i.e.,* whether the district court should have reviewed those materials.

As a threshold matter, we reject Rostenkowski's argument that the district court must review the grand jury materials solely because he is a Member of Congress. Rostenkowski asserts that "when a defendant moves to dismiss an indictment on Speech or Debate grounds, a court must look beyond the face of the indictment to determine whether protected materials were used in the preparation of the indictment"; indeed, he contends that we so held in *Rose*. But that is not correct. (Or as better put by Robert Herrick in "The Rose" (1647), "Ne'er the rose without the thorn"). In that case we considered only whether the use of Speech or Debate material in the preparation of a civil complaint would invalidate the complaint. We did not consider, much less determine the question with which we are concerned here—whether or when the district court must grant a motion for *in camera* review, made by a defendant searching for Speech or Debate materials. Nor need we answer that question today in order to conclude that the district court did not err by denying Rostenkowski's motion for *in camera* review. For regardless of the precise showing that a defendant must make in order to compel *in camera* review of grand jury material, we are confident that Rostenkowski has not made it.

As we have already seen, there is no reason on the face of the indictment to suggest that any Speech or Debate material was presented to the grand jury. Moreover, Rostenkowski offers virtually no specific reason to believe that such material was presented to the grand jury. Instead, he gives us only the general warning that "courts should be wary of accepting prosecutorial assurances that constitutional violations have not occurred" before the grand jury. Although Rostenkowski obviously cannot be expected to know exactly what transpired before the grand jury or what was presented to that body, he must be able to provide, either from the allegations of the indictment or from some other source, at least some reason to believe that protected information was used to procure his indictment. To give him a right to *in camera* review without any particular reason apart from his status as a Member of Congress and therefore a person protected by the Speech or Debate Clause would completely disregard the "long-established policy" in favor of grand jury secrecy, *see Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 1240–41, 3 L.Ed.2d 1323 (1959), and would fail to strike an appropriate (indeed any) balance between the grand jury's "functional independence from the Judicial Branch," *United States v. Williams,* 504 U.S. 36, 48, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992), and a Congressman's right to be free from prosecution for his legislative acts. Lacking any reason to think that prohibited material was submitted to the grand jury, we have no reason to believe that the district court's denial of his motion was in error, and we affirm that decision.

IV. CONCLUSION

We remand this case to the district court with instructions to consider in the first instance the impact of *Hubbard* upon Counts Seven, Nine, Eleven, Fourteen, Fifteen, and Seventeen of the indictment; and in further proceedings to disregard the allegations of the indictment that we have determined are non-justiciable under the doctrine of the separation of powers and the Rulemaking Clause. In all other respects, we affirm the orders of the district court.

*So ordered.*