**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RICHARD G. RENZI,
*Defendant-Appellant.*

No. 10-10088

D.C. No.
4:08-cr-00212-DCB-
BPV-1

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
February 17, 2011—San Francisco, California

Filed June 23, 2011

Before: Richard C. Tallman and Consuelo M. Callahan,
Circuit Judges, and Suzanne B. Conlon, District Judge.*

Opinion by Judge Tallman

*The Honorable Suzanne B. Conlon, United States District Judge for the Northern District of Illinois, sitting by designation.

## COUNSEL

Lanny A. Breuer, Assistant Attorney General; Jack Smith, Chief, Public Integrity Section, Criminal Division, United States Department of Justice; Andrew Levchuk (argued), Senior Trial Attorney, Public Integrity Section; Dennis K. Burke, United States Attorney, District of Arizona; Gary M. Restaino, Assistant United States Attorney; for plaintiff-appellee/cross-appellant United States of America.

Reid H. Weingarten, Brian M. Heberlig (argued), Linda C. Bailey, Steptoe & Johnson LLP, Washington, D.C.; Kelly B. Kramer, Nixon Peabody LLP, Washington, D.C.; for defendant-appellant/cross-appellee Richard G. Renzi.

Irvin B. Nathan, General Counsel, Office of General Counsel, United States House of Representatives, Washington, D.C.; Kerry W. Kircher, Deputy General Counsel (argued); Christine M. Davenport, John D. Filamor, Katherine E. McCarron, Ariel B. Waldman, Assistant Counsels; for Amicus Curiae Bipartisan Legal Advisory Group of the United States House of Representatives in Support of Reversal.

Melanie Sloan, Washington, D.C., for Amicus Curiae Citizens for Responsibility and Ethics in Washington in Support of Affirmance.

## OPINION

TALLMAN, Circuit Judge:

Former Arizona Congressman Richard G. Renzi seeks to invoke the Speech or Debate Clause[1] to preclude his prosecution for allegedly using his public office to benefit himself rather than his constituents. The indictment against him alleges that Renzi offered two private parties a *quid pro quo* deal. If they would buy private land owned by a former business partner—a sale that would generate enough cash to repay a debt owed to Renzi—the Congressman promised to support future public land exchange legislation favorable to each.

Renzi denies the charges against him, but argues on interlocutory appeal that he is protected by the Clause from even the burden of defending himself. Specifically, he claims that the public corruption charges against him amount to prosecution on account of his privileged "legislative acts"; that "legislative act" evidence was improperly presented to the grand jury; that the United States must show that its investigation did not benefit from its review of "legislative act" evidence; and that the district court erred by declining to wholly suppress all of the evidence against him relating to his illicit "negotiations."

We cannot agree. We recognize, as we must, that the Speech or Debate Clause is a privilege that "has enabled reckless men to slander and even destroy others with impunity." *United States v. Brewster*, 408 U.S. 501, 516 (1972). But the Supreme Court has made equally clear that the Speech or Debate Clause does not "make Members of Congress supercitizens, immune from criminal responsibility." *Id.* Because we cling to "the precise words" of the Court's own Speech or

---

[1] "[A]nd for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1.

Debate jurisprudence and "the sense of those cases, fairly read," *id.*, we conclude that Renzi's actions fall beyond the Clause's protections. We therefore deny Renzi the relief he seeks.[2]

# I

Renzi was elected to the United States House of Representatives in November 2002 as the representative for Arizona's First Congressional District.[3] He was sworn in the following January and, as a freshman congressman ("Member"), obtained a seat on the House Natural Resources Committee ("NRC")—the committee responsible for, among other things, approving of any land exchange legislation[4] before it can reach the floor of the House.

---

[2]In a separate memorandum disposition filed concurrently with this opinion, we also grant the Government's cross-appeal, No. 10-10122, and order reinstated the racketeering act dismissed by the district court.

[3]Because this matter arises on interlocutory appeal, the facts are largely derived from the allegations contained in the second superceding indictment against Renzi. We accept these allegations as true only for the purpose of resolving the important constitutional questions before us. *United States v. Fiander*, 547 F.3d 1036, 1041 n.3 (9th Cir. 2008) ("We presume the allegations of an indictment to be true for purposes of reviewing a district court's ruling on a motion to dismiss." (internal quotation marks and citation omitted)).

[4]Federal land exchanges involve the exchange of privately held land for federal land. Typically, land exchanges are facilitated by government agencies and must comply with three general requirements: the federal parcel and the private land must be appraised to ensure equal value, the exchange must comply with the National Environmental Protection Act, and the exchange must serve the public interest. *E.g.*, Bill Paul, Article, *Statutory Land Exchanges that Reflect "Appropriate" Value and "Well Serve" the Public Interest*, 27 Pub. Land & Resources L. Rev. 107, 115-16 (2006). Legislative land exchanges are separate vehicles that avoid all of these requirements. *Id.* at 122 (citing Robert B. Keiter, *Biodiversity Conservation and the Intermixed Ownership Problem: From Nature Reserves to Collaborative Processes*, 38 Idaho L. Rev. 301, 316 (2002)).

In 2004 and 2005, Resolution Copper Mining LLC ("RCC") owned the mineral rights to a large copper deposit located near Superior, Arizona, an area east of Phoenix. RCC was planning to extract the copper, but wanted first to secure ownership of the surface rights from the United States Government. To obtain these rights, RCC hired Western Land Group, a consulting firm, to assist it in acquiring private property that it could offer to the Government in exchange for the desired surface rights.

In 2005, Western Land Group approached Renzi about developing and sponsoring the necessary land exchange legislation. According to the allegations, Congressman Renzi met with RCC representatives in his congressional office in February 2005 and instructed them to purchase property owned by James Sandlin ("the Sandlin property") if RCC desired Renzi's support. Renzi never disclosed to RCC that Sandlin was a former business partner who, at that time, owed Renzi some $700,000 plus accruing interest.

RCC's negotiations with Sandlin were not fruitful. In March 2005, an RCC representative called Renzi to tell him that RCC had been unable to reach an agreement with Sandlin because Sandlin was insisting on unreasonable terms. Renzi reassured the representative that Sandlin would be more cooperative in the future. Later that day, RCC received a fax from Sandlin stating, "I just received a phone call from Congressman Renzi's office. They have the impression that I haven't been cooperating concerning this water issue. I feel I have been very cooperative . . . . I still want to cooperate." Nevertheless, no deal could be struck. In April, RCC informed Renzi that it would not acquire the Sandlin property. Renzi responded simply, "[N]o Sandlin property, no bill."

Within the week following the collapse of "negotiations" with RCC, Renzi began meeting with an investment group led by Philip Aries ("Aries"), which desired the same surface rights. According to the Government, Renzi again insisted

that the Sandlin property be purchased and included as part of any land exchange that took place. Again, he failed to disclose his creditor relationship with Sandlin. Upping the ante, Renzi told Aries that if the property was purchased and included, he would ensure that the legislation received a "free pass" through the NRC. Within a week, Aries agreed to purchase the property for a sum of $4.6 million and wired a $1 million deposit to Sandlin shortly thereafter.

Upon receiving that $1 million deposit, Sandlin wrote a $200,000 check payable to Renzi Vino, Inc., an Arizona company owned by Renzi. Renzi deposited the check into a bank account of Patriot Insurance—an insurance company he also owned—and used $164,590.68 to pay an outstanding Patriot Insurance debt. Later, when Aries appeared to grow nervous about the deal prior to closing on the Sandlin property, Renzi personally assured the group that he would introduce its land exchange proposal once the sale was complete. The day Aries closed, Sandlin paid into a Patriot Insurance account the remaining $533,000 he owed Renzi.[5] Ultimately, Renzi never introduced any land exchange bill involving Aries and the Sandlin property.

After an investigation,[6] two separate grand juries returned indictments against Renzi. On September 22, 2009, the second grand jury returned a second superseding indictment ("SSI") against Renzi and some of his cohorts. That indictment underlies the appeal we decide today and charges Renzi with 48 criminal counts related to his land exchange "negotia-

---

[5]This sum accounted for both the principal and the accrued interest.

[6]During the course of the Government's investigation, it interviewed Congressman Renzi's aides, reviewed documents provided by those aides, wiretapped Congressman Renzi's personal cell phone in accordance with a Title III Order, and searched, pursuant to a warrant, the office of Patriot Insurance. The evidence obtained from the wiretap was later suppressed because of violations of Renzi's attorney-client privilege. The Government does not challenge that ruling.

tions," including public corruption charges of extortion, mail fraud, wire fraud, money laundering, and conspiracy.[7]

Prior to this appeal, the district court issued three orders, each adopting the Report and Recommendation of Magistrate Judge Bernardo P. Velasco. First, the court denied Renzi's motion for a *Kastigar*-like hearing,[8] after determining that the Clause's privilege "is one of use, not non-disclosure." Second, the district court denied Renzi's motion to dismiss the indictment in its entirety because it agreed that Renzi's "negotiations" with RCC and Aries did not fall within the Clause's protections and because the limited legislative act evidence presented to the SSI grand jury did not warrant dismissal.

Finally, in its third order, the district court declined to suppress evidence related to Renzi's "negotiations" with RCC and Aries. We take special note of the fact that the district court did not rule, as Renzi implies, that all such evidence would be admissible. It simply concluded that blanket suppression of all the Government's evidence was inappropriate and that it would address the propriety of each piece of evidence "as the Government moves to introduce it" at trial.

Renzi timely filed this interlocutory appeal.

---

[7]Counts 1 through 27 of the SSI charge Renzi and Sandlin with various public corruption offenses related to the land exchange negotiations, including Hobbs Act extortion, mail fraud, honest services wire fraud, and money laundering. Counts 28 through 35 charge Renzi and another individual with various insurance fraud offenses. Counts 36 through 46 charge Renzi with additional insurance fraud offenses. Count 47 charges Renzi with a RICO violation. Count 48 charges Renzi with a tax offense, and Count 49 charges Sandlin with a campaign finance offense.

[8]In *Kastigar*, the Court held that, when prosecuting an individual who has been granted immunity in exchange for his or her testimony, the Government bears an affirmative burden of demonstrating that it has not used that testimony, or any evidence derivative of that testimony, to further the prosecution. *Kastigar v. United States*, 406 U.S. 441, 460-61 (1972).

## II

Because Renzi raises his claims on interlocutory appeal, our jurisdiction—to the extent it exists—must be founded upon the collateral order doctrine. *Helstoski v. Meanor*, 442 U.S. 500, 506-07 (1979); *cf.* 28 U.S.C. § 1291. As the Supreme Court explained in *Meanor*, this doctrine affords us jurisdiction to review a Member's interlocutory claim that an indictment against him should be dismissed as violative of the Speech or Debate Clause. 442 U.S. at 507-08 ("[I]f a Member 'is to avoid *exposure* to [being questioned for acts done in either House] and thereby enjoy the full protection of the Clause, his . . . challenge to the indictment must be reviewable before . . . exposure [to trial] occurs.' " (first alteration added) (quoting *Abney v. United States*, 431 U.S. 651, 662 (1977))). We therefore address the first three of Renzi's claims to the extent each pertains to the viability of the indictment itself. *See United States v. Jefferson*, 546 F.3d 300, 309 (4th Cir. 2008); *United States v. McDade*, 28 F.3d 283, 288-89 (3d Cir. 1994) (Alito, J.).

Renzi's remaining claim—that the district court erred by denying his motion to suppress—does not appear to fall under that same jurisdictional grant, however. *McDade*, 28 F.3d at 301-02. In *Meanor*, the Court relied on its Double Jeopardy jurisprudence, specifically *Abney*, to guide its inquiry into the application of the collateral order doctrine to Speech or Debate claims. *Meanor*, 442 U.S. at 506-08 (observing that its "characterization [in *Abney*] of the purpose of the Double Jeopardy Clause echoed th[e] Court's statement in *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (per curiam), that the Speech or Debate Clause was designed to protect Congressmen 'not only from the consequences of litigation's results but also from the burden of defending themselves' " (internal citation amended to comport with modern citation style)). In *Abney*, the Court explicitly distinguished challenges to indictments—to which the collateral order doctrine applied

—from challenges to district court rulings on motions to suppress—to which it did not:

> [T]he very nature of a double jeopardy claim is such that it is collateral to, and separable from, the principal issue at the accused's impending criminal trial, i.e., whether or not the accused is guilty of the offense charged. In arguing that the Double Jeopardy Clause of the Fifth Amendment bars his prosecution, the defendant makes no challenge whatsoever to the merits of the charge against him. *Nor does he seek suppression of evidence which the Government plans to use in obtaining a conviction.* Rather, he is contesting *the very authority of the Government to hale him into court to face trial on the charge against him.*

*Id.* at 507 (first emphasis added) (quoting *Abney*, 431 U.S. at 659). As *Abney* guided the Court in *Meanor*, so it guides us today. We lack jurisdiction under the collateral order doctrine to consider Renzi's suppression claim and thus dismiss that part of his appeal.

### III

Having disposed of one of Renzi's four claims, we turn to the merits of those that remain. To reiterate, Renzi argues first that the district court erred by not dismissing the Government's public corruption charges against him because, as he contends, those charges are based on his "legislative acts" or his motivation for his "legislative acts" and would require the introduction of "legislative act" evidence. Renzi also claims that the district court erred by not dismissing the SSI in its entirety because, as he contends, "legislative act" evidence permeated the Government's presentation to the grand jury. Finally, Renzi asserts that the district court erred by refusing to hold a *Kastigar*-like hearing to determine whether the Government used evidence protected by the Speech or Debate

Clause to obtain non-privileged evidence and whether the government can prove its case without allegedly tainted evidence.

After careful consideration, we reject each of these claims.

**A**

We address first whether Renzi's "negotiations" with RCC and Aries are protected "legislative acts."

If they are, we recognize that Renzi would obtain the benefit of three distinct protections. First, the Government would be barred by the Clause's privilege against liability from prosecuting Renzi for those acts, *e.g.*, *Gravel v. United States*, 408 U.S. 606, 616 (1972), regardless of his motivation, *United States v. Johnson*, 383 U.S. 169, 180 (1966) ("The claim of an unworthy purpose does not destroy the privilege." (internal quotation marks and citation omitted)). Second, the Government would be precluded from compelling Renzi, or his aides, to "testify[ ] at trials or grand jury proceedings" about that conduct. *E.g.*, *Gravel*, 408 U.S. at 622 (explaining that neither Member nor aide is immunized from testifying at trials or grand jury proceedings if the testimony does not concern or impugn a legislative act). And, third, evidence of those acts could not be introduced to any jury, grand or petit. *E.g.*, *United States v. Helstoski*, 442 U.S. 477, 489 (1979) ("The Clause . . . 'precludes any showing of how [a legislator] acted, voted, or decided.' " (second alteration in original) (quoting *Brewster*, 408 U.S. at 527)); *id.* at 490 ("Revealing information as to a legislative act—speaking or debating—to a jury would subject a Member to being 'questioned' in a place other than the House or the Senate, thereby violating the explicit prohibition of the Speech or Debate Clause."); *cf. Gravel*, 408 U.S. at 629 n.18.

However, if Renzi's "negotiations" are not "legislative acts," then the Clause's protections would not shield them.

The Government could prosecute Renzi for his allegedly corrupt conduct, and neither the testimonial nor evidentiary privileges would apply. *Brewster*, 408 U.S. at 510, 525-27 ("[T]he Court in *Johnson* emphasized that its decision did not affect a prosecution that, though founded on a criminal statute of general application, 'does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them.' " (quoting *Johnson*, 383 U.S. at 185)).

To resolve our inquiry, we first review Supreme Court precedent describing the character of a protected "legislative act," paying particular care to that conduct the Court considered beyond the reach of the Clause. We then apply that precedent to determine whether Renzi's conduct falls within the sweep of the Clause's protection. We conclude that it does not and therefore see no reason to bar Renzi's prosecution for the charges alleged.

**1**

Before wading too deeply into the merits of this claim, we resolve a threshold issue: the standard of review by which to assess Renzi's claim. This is an issue of first impression in this Circuit, but it is not a difficult one. Whether the Clause precludes Renzi's prosecution is a question of law, *see United States v. Ziskin*, 360 F.3d 934, 942-43 (9th Cir. 2003) ("The factor determining the standard of review is not whether the facts are disputed nor whether the appeal is from a final judgment; rather, it turns on whether the district court has answered a legal question or made a factual determination."), and we already review de novo identical claims founded on Double Jeopardy concerns, *id*. Like our sister circuits, we see no reason to treat motions founded on the Speech or Debate Clause any differently. *Cf. Meanor*, 442 U.S. at 506-08; *United States v. Swindall*, 971 F.2d 1531, 1543 (11th Cir. 1992) (de novo); *MINPECO S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988) (same). "We review the district court's denial of the motion to dismiss . . . de

novo" and "accept the district court's factual findings unless they are clearly erroneous." *Ziskin*, 360 F.3d at 942.

**2**

**[1]** Because the protections of the Clause apply absolutely when they apply, the limits of what may constitute a protected "legislative act" is of fundamental importance. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). In first passing on the issue in *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880) (citing *Coffin v. Coffin*, 4 Mass. 1 (1808) (Parsons, C.J.), with approval), the Court struck a delicate balance between the interests of the three co-equal branches of Government when it declined to limit the Clause's reach to "words spoken in debate," holding instead that the Clause applies "to things generally done *in a session of the House* by one of its members in relation to the business before it." *Id.* (emphasis added); *accord Gravel*, 408 U.S. at 617.

**[2]** Since *Kilbourn*, the Court has declined to alter that balance. *See, e.g.*, *Brewster*, 408 U.S. at 512-14 (relying on *Kilbourn* and rejecting Congressman Brewster's assertion that the Court had "expressed a broader test for the coverage of the Speech or Debate Clause" in *Johnson*, 383 U.S. 169). As a result, a broad range of activities other than literal speech or debate continue to fall within the contours of a "legislative act":

> Prior cases have read the Speech or Debate Clause 'broadly to effectuate its purposes,' *Johnson*, 383 U.S. at 180, and have included within its reach anything 'generally done in a session of the House by one of its members in relation to the business before it.' *Kilbourn*, 103 U.S. at 204; *Johnson*, 383 U.S. at 179. Thus, voting by Members and committee reports are protected; and we recognize today—as the Court has recognized before, *Kilbourn*, 103 U.S. at 204; *Tenney v. Brandhove*, 341 U.S. 367, 377-78

(1951)—that a Member's conduct at legislative com-
mittee hearings, although subject to judicial review
in various circumstances, as is legislation itself, may
not be made the basis for a civil or criminal judg-
ment against a Member because that conduct is
within the 'sphere of legitimate legislative activity.'
*Tenney*, 341 U.S. at 376.

*Gravel*, 408 U.S. at 624 (some citations amended to comport
with modern citation style); *see also Eastland*, 421 U.S. at
504 (conducting official congressional inquiries); *Doe v.
McMillan*, 412 U.S. 306, 312-13 (1973) (compiling commit-
tee reports); *Brewster*, 408 U.S. at 526 ("The question is
whether it is necessary to inquire into how appellee spoke,
how he debated, how he voted, or anything he did in the
chamber or in committee in order to make out a violation of
this statute.").

**[3]** This broad sweep of protection is not without limits,
however. Reacting to an increasingly broad invocation of the
Clause, the Court clarified that it had never indicated that "ev-
erything that 'related' to the office of a Member was shielded
by the Clause." *Brewster*, 408 U.S. at 513-14. Rather, the
Court explained that, "[i]n every case thus far before this
Court, the Speech or Debate Clause has been limited to an act
which was clearly a part of the legislative process—the due
functioning of the process," *id.* at 515-16, and, as such, many
activities that a Member might be *expected to perform* would
not fall within the Clause's protections:

It is well known, of course, that Members of the
Congress engage in many activities other than the
purely legislative activities protected by the Speech
or Debate Clause. These include a wide range of
legitimate 'errands' performed for constituents, the
making of appointments with Government agencies,
assistance in securing Government contracts, prepar-
ing so-called 'news letters' to constituents, news

releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause.

*Id*. at 512; *McMillan*, 412 U.S. at 313 ("Our cases make perfectly apparent, however, that everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause."); *see also Eastland*, 421 U.S. at 504 (querying whether an activity was " 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings' " (quoting *Gravel*, 408 U.S. at 625)).

**[4]** In addition, the Court has recognized a marked distinction between completed "legislative acts" and mere promises to perform future "legislative acts." *Helstoski*, 442 U.S. at 489-490. Completed "legislative acts" are protected; promises of future acts are not. *Id*. ("But it is clear from the language of the Clause that protection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.' Likewise, a *promise* to introduce a bill is not a legislative act."); *Brewster*, 408 U.S. at 525-29 (permitting the prosecution of Brewster for his promise to perform specific future "legislative acts" in exchange for a bribe).

With this guiding framework in mind, we turn to the case before us.

**3**

The district court determined that Congressman Renzi's "negotiations" with RCC and Aries were not privileged because Renzi had only promised to support *future* legislation through *future* acts. It found the Supreme Court's example in *Brewster* particularly compelling and declined to deviate from its result.

On appeal, Renzi argues that the district court drew too fine a line between present and future conduct. He asserts that the very act of "negotiating" with private entities over future legislation is analogous to discourse between legislators over the content of a bill and must be considered a protected "legislative act" under a broad construction of the Clause. He also contends that his prosecution must be barred to avoid impugning later "legislative acts." Finally, he argues that even if his promise of future action would not be protected under Supreme Court precedent, it would be protected under our decision in *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the 'things generally done in the session of the House' concerning matters within the 'legitimate legislative sphere.' Constituents may provide data to document their views when urging the Congressman to initiate or support some legislative action." (internal citations omitted)).

**[5]** We disagree with each of Renzi's contentions. In *Brewster*, the Court rejected Renzi's first argument—the contention that a Member's pre-legislative act negotiations with private parties are themselves "legislative acts." 408 U.S. at 516, 529. There, it considered whether the Clause precluded the Government from prosecuting Congressman Daniel B. Brewster *for negotiating with and ultimately promising private individuals that he would perform future legislative acts in exchange for private gain*—in that case, a cash bribe.[9] *Id.*

---

[9]Brewster was alleged to have "corruptly asked, solicited, sought, accepted, received and agreed to receive money in return for being influ-

at 502. Like Renzi, Brewster argued that his pre-legislative "negotiations" were a regular and necessary part of the legislative process that the Court should recognize as protected by the Clause. *See id.* at 502, 516. The Court was unconvinced:

> Appellee's contention for a broader interpretation of the privilege draws essentially on the flavor of the rhetoric and the sweep of the language used by courts, not on the precise words used in any prior case, and surely not on the sense of those cases, fairly read.
>
> (c) *We would not think it sound or wise, simply out of an abundance of caution to doubly insure legislative independence, to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process. Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process.* Admittedly, the Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch, but no more than the statutes we apply, was its purpose to make Members of Congress super-citizens, immune from criminal responsibility.

*Id.* at 516 (emphasis added); *see also id.* at 526.

**[6]** The Court then focused on the specific nature of Brewster's "negotiations," his solicitation and acceptance of a

___

enced in his performance of his official acts in respect to his action, vote, and decision on postage rate legislation which might at any time be pending before him in his official capacity." 408 U.S. at 502, 525 (internal quotation marks omitted).

bribe, to determine whether the Congressman's *specific* conduct might fall within the Clause's protections. Not surprisingly, it found Brewster's acts to be uniquely un-legislative and squarely dismissed Brewster's second argument, also echoed by Renzi today, that the prosecution was simply a veiled attempt to inquire as to the motivation for those later "legislative acts" actually performed:

> Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act. It is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator. It is not an 'act resulting from the nature, and in the execution, of the office.' Nor is it a 'thing said or done by him, as a representative, in the exercise of the functions of that office,' *Coffin*, 4 Mass. at 27. Nor is inquiry into a legislative act or the motivation for a legislative act necessary to a prosecution under this statute or this indictment. When a bribe is taken, it does not matter whether the promise for which the bribe was given was for the performance of a legislative act as here or, as in *Johnson*, for use of a Congressman's influence with the Executive Branch. And an inquiry into the purpose of a bribe 'does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them.' *Johnson*, 383 U.S. at 185.

*Id.* at 526 (citations amended to comport with modern citation style).

One might think that this would be the end of the matter—that Renzi would concede that *Brewster* forecloses his claim. Instead, Renzi contends that *his* pre-legislative "negotiations" are not doomed to the same fate as Brewster's because he was charged with extortion, not bribery. He reasons that *Brewster* was premised on the idea that there was no legitimate explanation for Brewster's acceptance of a bribe, and that, unlike

Brewster, he has a legitimate explanation for his deeds. In short, Renzi relies on the fact that, as charged, his deceit was more refined, more sophisticated, than Brewster's. Rather than selling his office for cash, he was wise enough to at least attempt to conceal his crime by using more indirect means of payment. We think Renzi relies on a distinction without a difference. *See McDade*, 28 F.3d at 296 n.16 (refusing to distinguish between bribery and extortion charges against a Member and reasoning that *Brewster* applied to both).

**[7]** First, the Court has already considered and rejected the contention that the Clause should be extended to preclude inquiry into any legislative activity with some degree of facial validity:

> Mr. Justice WHITE suggests that permitting the Executive to initiate the prosecution of a Member of Congress for the specific crime of bribery is subject to serious potential abuse that might endanger the independence of the legislature—for example, a campaign contribution might be twisted by a ruthless prosecutor into a bribery indictment. But, as we have just noted, the Executive is not alone in possessing power potentially subject to abuse; such possibilities are inherent in a system of government that delegates to each of the three branches separate and independent powers.

> \* \* \*

> We therefore see no substantial increase in the power of the Executive and Judicial Branches over the Legislative Branch resulting from our holding today. If we underestimate the potential for harassment, the Congress, of course, is free to exempt its Members from the ambit of federal bribery laws, but it has deliberately allowed the instant statute to remain on the books for over a century.

*Brewster*, 408 U.S. at 521-22, 524; *see also United States v. Rostenkowski*, 59 F.3d 1291, 1303 (D.C. Cir. 1995) ("[T]o the extent that [Congressman] Rostenkowski himself chooses to present evidence of his status or activities as a legislator, we agree with the Second and Third Circuits that the constitutional protection against his being 'questioned' for his legislative acts 'does not prevent [a Member of Congress] from offering such acts in his own defense, even though he thereby subjects himself to cross-examination.' "); *McDade*, 28 F.3d at 294-95.

In addition, Renzi fails to consider that the Court's pointed condemnation of Brewster's specific crime, solicitation of a bribe, came only after the Court had already expressed, in general terms, its refusal to expand the Clause to protect the type of private negotiations between Members and constituents at issue here:

> The sweeping claims of appellee would render Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office. *Such claims are inconsistent with the reading this Court has given, not only to the Speech or Debate Clause, but also to the other legislative privileges embodied in Art. I, § 6.*

*Brewster*, 408 U.S. at 520 (emphasis added); *see also id.* at 516; *Johnson*, 383 U.S. at 185 (permitting the Government to re-prosecute a former Member for conspiring to defraud the United States by accepting cash payments in exchange for, among other things, delivering a speech on the floor of the House, so long as that prosecution did not require evidence of the completed legislative act—the speech).

**[8]** This point is evidenced not only by the Court's words in *Brewster*, but also by its example. *Cf.* 408 U.S. at 526. As discussed, when the Clause applies, it applies absolutely.

*Eastland*, 421 U.S. at 503. If the Clause protects particular legislative activity, the fact that the activity was undertaken for an illicit purpose is of no consequence; the Clause applies in equal force to protect "legislative acts" regardless of a Member's alleged motivation. *E.g.*, *id.* at 508-09 ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection histori-cally undergirding it." (discussing *Brewster*)). *Brewster* did not except itself from this foundational principle. Thus, the fact that the Court permitted Brewster's prosecution for his alleged purpose in negotiating with private parties, solicitation of a bribe, demonstrates that private negotiations between Members and private parties are not protected "legislative acts" in any case:

> *The question is whether it is necessary to inquire into how appellee spoke, how he debated, how he voted, or anything he did in the chamber or in com-mittee* in order to make out a violation of this statute. The illegal conduct is taking or agreeing to take money for a promise to act in a certain way. There is no need for the Government to show that appellee fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise.

*Brewster*, 408 U.S. at 526 (emphasis added); *Johnson*, 383 U.S. at 185; *see also Brewster*, 408 U.S. at 528.

Having concluded that the Court's precedent is of no aid to Renzi's cause, we move to his final argument—that our own precedent has moved the bounds of Clause protection beyond the line drawn by the Court in *Brewster* and *Johnson* to pro-tect a Member's pre-legislation investigation and fact-finding. *Cf. Miller*, 709 F.2d at 530. The argument is a clever one. If Renzi's unprotected negotiations are sufficiently cloaked under a broader category of protected legislative activity, i.e.,

an investigation, then the Clause would fall like an iron curtain to preclude prosecution for the otherwise unprotected activity as well. *See Helstoski*, 442 U.S. at 489-90.

**[9]** The flaw in Renzi's reasoning is small, but it makes all the difference. Even assuming *Miller* appropriately applied Supreme Court precedent when it concluded that unofficial investigations by a single Member are protected from civil discovery to the same extent as official investigations by Congress as a body,[10] *Miller* expressly limited its holding to circumstances in which no part of the investigation or factfinding itself constituted a crime.[11] 709 F.2d at 530 ("Only one other court has directly confronted our situation, where a *civil litigant* seeks information about a nonparty Congressman's source of information *and the source's revelation of the information did not constitute a crime*." (emphasis added)). This careful caveat was no mere afterthought. Rather, it reflects the Court's own admonishments that the Clause does not protect unlawful investigations by Members —even if performed by Congress *as a body*:

> [N]o prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, *in order to secure information for a hearing*,

---

[10]We think it significant that the Supreme Court has never recognized investigations by an individual Member to be protected. *See, e.g.*, *Brewster*, 408 U.S. at 525-26; *Johnson*, 383 U.S. at 171-72, 185. It has held only that when Congress, acting as a body, employs its constitutional power to investigate, such official investigations are quintessential "legislative acts." *Eastland*, 421 U.S. at 503-04; *McMillan*, 412 U.S. at 312-13.

[11]We are not alone in making this distinction. *E.g.*, *McSurely v. McClellan*, 553 F.2d 1277, 1288 (D.C. Cir. 1976) (en banc) ("The employment of unlawful means to implement an otherwise proper legislative objective is simply not 'essential to legislating.' As with taking a bribe, resort to criminal or unconstitutional methods of investigative inquiry is 'no part of the legislative process or function; it is not a legislative act.' " (quoting *Brewster*, 408 U.S. at 526)).

themselves seized the property or invaded the privacy of a citizen. . . . Such acts are no more essential to legislating than the conduct held unprotected in *United States v. Johnson* . . . .

\* \* \*

Article I, § 6, cl. 1, as we have emphasized, does not purport to confer a general exemption upon Members of Congress from liability or process in criminal cases. Quite the contrary is true. While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, *it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts*.

*Gravel*, 408 U.S. at 621-22, 626 (emphasis added); *cf. Eastland*, 421 U.S. at 508 (protected if "essential to legislating"). Because Renzi is alleged to have done just that—"violate[d] an otherwise valid criminal law in preparing for or implementing [his] legislative acts," *id.*—*Miller* cannot support his claim.[12]

   **[10]** Thus, we find ourselves, at base, with a claim no different than that raised by Brewster. Like the district court, we see no reason to deviate from the example of the Court. *Brewster*, 408 U.S. at 526, 528-29. The district court properly

---

[12]Renzi asserts that this reasoning is improper because it equates to an inquiry into his motivation—a proposition the Court, as described, has refuted. Were the Court to have extended Clause protection to prelegislative investigations and fact-finding by individual Members, we would agree. However, it has not. *Supra* note 10. Instead, the Court has stated that illegal investigatory or preparatory acts are not protected "legislative acts." *Gravel*, 408 U.S. at 621-22; *see also Brewster*, 408 U.S. at 526; *accord McSurely*, 553 F.2d at 1288. To the extent these specific edicts contradict more sweeping language, we adhere to them.

denied Renzi's motion to dismiss the public corruption charges against him.

## B

We next address whether the district court erred by declining to dismiss the indictment in its entirety for, as Renzi alleges, the pervasive presentment of "legislative act" evidence to the grand jury.

To resolve this issue, we first consider whether Renzi's allegation of Speech or Debate violations permits us to go behind the face of the indictment to inquire as to the evidence considered by the SSI grand jury. *Compare Jefferson*, 546 F.3d at 313-14 (concluding that a court need not look behind the face of an indictment to see if Speech or Debate materials were presented to a grand jury provided that none are presented at trial), *with Swindall*, 971 F.2d at 1546-50 (concluding that a court should look behind the face of an indictment), *Rostenkowski*, 59 F.3d at 1300 (same), *and United States v. Helstoski* (*Helstoski II*), 635 F.2d 200, 205 (3d Cir. 1980) (same). We further consider whether any protected material was disclosed to that grand jury and, if so, whether that material "caused the jury to indict." *Swindall*, 971 F.2d at 1546-50 ("[W]hen improper evidence is considered by a grand jury, a Speech or Debate violation occurs only if the evidence causes the jury to indict."); *see also Brewster*, 408 U.S. at 511-12, 526-27; *Johnson*, 383 U.S. at 185. Because the indictment against Renzi does not depend on "legislative act" evidence, we hold that dismissal is not warranted.

## 1

Generally speaking, "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra*, 414 U.S. 338, 345 (1974) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956) (concluding that

an indictment premised on hearsay was not subject to challenge under the Fifth Amendment "on the ground that there was inadequate or incompetent evidence before the grand jury"); *Holt v. United States*, 218 U.S. 245, 247-48 (1910) (refusing to dismiss an indictment because "there was very little evidence against the accused" besides "admissions . . . obtained under circumstances that made them incompetent")).

As the Court explained in *Calandra*, this is because a grand jury's use of inadequate or incompetent evidence "involve[s] no independent governmental invasion of one's person, house, papers, or effects, but rather the usual abridgment of personal privacy common to all grand jury questioning." *Id.* at 354 (discussing in the Fourth Amendment context). It thus "presents a question, not of rights, but of remedies," and the Court has determined that the regular operation of generally applicable rules of procedure and evidence *at trial* is the appropriate remedy. *Id.* (refusing to extend the exclusionary rule to the "context of a grand jury proceeding" because "the damage to that institution from the unprecedented extension of the exclusionary rule urged by respondent outweighs the benefit of any possible incremental deterrent effect"). Because that remedy bears no relation to a grand jury's deliberations, there is no cause to go behind the face of the indictment in ordinary cases. *Id.* at 345-46.

**[11]** Renzi's case is no ordinary one, however. Even in *Calandra*, the Court noted that a grand jury cannot itself "violate a valid privilege, whether established by the Constitution, statutes, or the common law," in order to effectuate its duties. *Id.* at 346. Were it to do so, the jury's actions would work a new wrong, a new independent invasion, and thus present, presumably, a question of both rights and remedies. *See id.* at 354; *Kastigar v. United States*, 406 U.S. 441, 443-45, 449 (1972) (immunity privilege); *cf. Calandra*, 414 U.S. at 346 (not describing a remedy for an independent violation by a grand jury).

**[12]** Because the Clause precludes any jury from "question[ing]" a Member about his "legislative acts," *e.g.*, *Helstoski*, 442 U.S. at 489-90, Renzi's claim implicates this latter concern for an independent violation. If the SSI grand jury "questioned" Renzi about his "legislative acts," then it committed a new, independent violation of the privilege provided by the Clause. *Compare id.*, *with Calandra*, 414 U.S. at 346. Still, assuming Renzi's claim involves a question of a right, the issue of the appropriate remedy remains. We must decide whether Renzi's claim, if proven, would permit him the relief he seeks, dismissal of the indictment, which would provide us with the predicate justification to go behind the face of the SSI.

Despite the fact that "[t]he Court . . . has never held that a speech or debate violation before the grand jury necessitates the quashing of the indictment," *Helstoski II*, 635 F.2d at 204, the bulk of our sister circuits have held that it would. *E.g.*, *Swindall*, 971 F.2d at 1544 ("Protection from criminal liability includes protection from prosecution, not merely from conviction."); *Helstoski II*, 635 F.2d at 204 (reasoning that the "purposes served by invoking the speech or debate clause vary greatly from those that the Supreme Court has considered and rejected in other cases seeking to quash indictments"). They have therefore found it necessary in cases like Renzi's to go behind the face of the indictment:

> In order fully to secure th[e] purposes [of the Speech or Debate Clause], it seems that a court may find it necessary, at least under some circumstances, to look beyond the face of an indictment and to examine the evidence presented to the grand jury. Otherwise, a prosecutor could with impunity procure an indictment by inflaming the grand jury against a Member upon the basis of his Speech or Debate, subject only to the necessity of avoiding any reference to the privileged material on the face of the indictment.

*Rostenkowski*, 59 F.3d at 1298 (internal citation omitted); *Swindall*, 971 F.2d at 1547; *Helstoski II*, 635 F.2d at 204-05. *But see Jefferson*, 546 F.3d at 313 ("[W]hen an indictment is facially valid and the grand jury was 'legally constituted and unbiased,' the competency and adequacy of the evidence presented to it is not subject to challenge.").

**[13]** We agree. A court cannot permit an indictment *that depends* on privileged material to stand—and burden a Member with litigation that ultimately cannot succeed—or else the Clause loses much of its teeth. *Eastland*, 421 U.S. at 503 ("[L]egislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.' " (quoting *Dombrowski*, 387 U.S. at 85)); *Helstoski II*, 635 F.2d at 205 ("A hostile executive department may effectively neutralize a troublesome legislator, despite the absence of admissible evidence to convict, simply by ignoring or threatening to ignore the privilege in a presentation to a grand jury. Invocation of the constitutional protection at a later stage cannot undo the damage. If it is to serve its purpose, the shield must be raised at the beginning."). Moreover, in other analogous contexts, the Court has ordered the dismissal of an indictment to remedy independent violations by a grand jury. *United States v. Hubbell*, 530 U.S. 27, 45-46 (2000). We see no reason to treat differently new, independent Speech or Debate violations by a grand jury. *Cf. id.*

**[14]** Still, the mere fact that some "legislative act" evidence was presented to the grand jury cannot entitle Renzi to dismissal. That would contravene the Court's example in *Brewster* and *Johnson*—two cases in which the Court decided that dismissal of the indictment was not warranted even though each Member was indicted by grand juries to whom the Government had presented "legislative act" evidence. *Johnson*, 383 U.S. at 185 ("The Court of Appeals' opinion can be read as dismissing the conspiracy count in its entirety

. . . . [W]e think the Government should not be precluded from a new trial on this count . . . wholly purged of elements offensive to the Speech or Debate Clause."); *see Brewster*, 408 U.S. at 511-12, 526-27 (reversing the district court's dismissal of the indictment even though "the indictment charges the offense as being in part linked to Brewster's 'action, vote and decision on postage rate legislation' ").

**[15]** The solution to this problem of words and deeds is the middle ground upon which the Eleventh Circuit plants its flag in *Swindall*: an indictment need not be dismissed unless the "evidence [presented to the grand jury] *causes* the jury to indict." 971 F.2d at 1549 ("an essential element of proof") (citing *Brewster*, 408 U.S. at 511-12, 526-27, and *Johnson*, 383 U.S. at 185). As the court explained:

> A member's Speech or Debate privilege is violated if the Speech or Debate material exposes the member to liability, but a member is not necessarily exposed to liability just because the grand jury considers improper Speech or Debate material. "A member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." *Brewster*, 408 U.S. at 512. *If reference to a legislative act is irrelevant to the decision to indict, the improper reference has not subjected the member to criminal liability. The case can proceed to trial with the improper references expunged.*

*Id.* at 1548 (citation style amended and footnote omitted) (emphasis added).

**[16]** We think *Swindall* represents an elegant solution to an awkward problem—how to provide a remedy sufficiently measured that it protects a Member's privilege without transforming the shield of the Clause into a sword that unscrupulous Members might wield to avoid prosecution for even

unprotected acts. We therefore adopt that standard and look behind the face of the indictment to evaluate whether Clause materials *caused* the grand jury to indict. *Id.*; *see Johnson*, 383 U.S. at 185; *Helstoski II*, 635 F.2d at 205 (dismissing the entire indictment because of "wholesale violation of the speech or debate clause before a grand jury").

**2**

Before the district court, Renzi challenged the presentment of specific excerpts of grand jury testimony by RCC and Aries representatives, as well as the introduction of nineteen documentary exhibits,[13] on the general ground that they either (1) "reference, describe and directly involve the development of legislation," (2) "discuss meetings about legislation," or (3) "involve the introduction of legislation." After reviewing the testimony and the exhibits, the district court found no fault in the testimony but upheld Magistrate Judge Velasco's order striking nine exhibits for referencing protected acts.[14] It then applied the *Swindall* standard and, finding that the struck exhibits did not *cause* the jury to indict, declined to dismiss the indictment.

[17] On appeal, Renzi reiterates his complaints regarding the testimony and the Government's presentment of "numerous documents" that "describe or reference Congressman Renzi's negotiations, discussions and correspondence with RCC and Aries." Looking first to the propriety of the testimony, we find no error. As explained by Renzi, the representatives' testimony concerned their meetings and negotiations with Renzi, in which he insisted that they acquire the Sandlin property if they desired his support. As previously discussed, these negotiations are not "legislative acts." *Brewster*, 408

---

[13]Renzi challenged SSI Grand Jury Exhibits 7, 10, 13, 15-17, 28, 29, 36-39, 41, 43, 48, 49, 58, 91, and 95.

[14]Magistrate Judge Velasco struck Exhibits 13, 15, 16, 29, 37, and 43 per Renzi's request and *sua sponte* struck Exhibits 44, 45, and 60.

U.S. at 526; *Johnson*, 383 U.S. at 185; *cf. Miller*, 709 F.2d at 530. The Clause thus did not bar their disclosure to the grand jury.

Turning to the issue of the "numerous documents," we think it incumbent on Renzi to bring to our attention those specific exhibits that cause him concern. *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1007 n.1 (9th Cir. 2000) ("[I]t behooves parties to treat appellate panels not as if we were pigs sniffing for truffles, but instead to fill our troughs to the brim with the relevant, let alone necessary, information." (internal citation omitted)). We thus confine our focus to those particular exhibits we were able to glean from his briefs.[15] After paring away those never presented to the SSI grand jury,[16] we are left with fifteen: the nine struck below, as well as Exhibits 21, 33, 41, 58, 95, and 96. Because the Government does not contest the court's findings regarding the nine already struck, we presume each violative and concern ourselves with the other six—three of which appear to be "newly offensive."[17]

[18] Turning first to those documents the district court found unprotected, we think the district court and Magistrate Judge Velasco "drew the line precisely where it should have been drawn." Exhibit 41 describes Renzi's demand to RCC that it purchase the Sandlin property if it desired his future

---

[15]One might logically assume that no "other" violative materials *caused* the jury to indict if Renzi himself feels it unnecessary to bring them to our —or the district court's—attention.

[16]Renzi did not contest the Government's assertion that he complained of documents in his briefs that were never presented to the SSI grand jury.

[17]Exhibits 21, 33, and 96 are challenged with specificity for the first time on appeal. Because we ultimately find each of these exhibits to be irrelevant to the grand jury's decision to indict, we do not engage in a protracted "plain error" analysis. Given the interests at issue, we simply assume, without deciding, that were the *Swindall* test to be met, so too would the substantial rights requirement of Federal Rule of Criminal Procedure 52."

support, including his statement, "no Sandlin property, no bill." That demand is not a "legislative act." *Helstoski*, 442 U.S. at 490 ("[A] promise to introduce a bill is not a legislative act."); *Brewster*, 408 U.S. at 525-26. Exhibit 58, an RCC document describing RCC's efforts to acquire the Sandlin property, is no different. Neither is Exhibit 95, another RCC document describing Renzi's promise to request a hearing if RCC performed certain specified acts. *Helstoski*, 442 U.S. at 490.

[19] The same cannot be said for the "newly offensive" exhibits, however. Exhibit 21 is a map of property included in the "Petrified Forest — San Pedro River Land Exchange Act," and Exhibits 33 and 96 are internal RCC emails that discuss, at least in some part, the status of actual legislation. To the extent each references actual "legislative acts," it should not have been presented to the grand jury. *Id.* ("As to what restrictions the Clause places on the admission of evidence, our concern is not with the 'specificity' of the reference. Instead, our concern is whether there is mention of a legislative act.").[18]

Of course, identifying the violative exhibits only puts the ball on the tee. We must still decide the dispositive question: whether the twelve documents[19] the Government impermissibly presented to the SSI grand jury *caused* the grand jury to indict. Comparing those documents to the charges against Renzi—e.g., conspiracy to commit extortion and wire fraud, honest services wire fraud, conspiracy to commit money laun-

---

[18]Though the documents should not have been presented to the grand jury in their current form, we note that the Clause would not bar their introduction at trial if properly redacted. *Helstoski*, 442 U.S. at 489 n.7 ("Nothing in our opinion, by any conceivable reading, prohibits excising references to legislative acts, so that the remainder of the evidence would be admissible. This is a familiar process in the admission of documentary evidence.").

[19]We must consider the three exhibits discussed herein and the nine documents previously struck.

dering, and Hobbs Act extortion under color of official right —we see no basis for such a conclusion.

The charges against Renzi concern, as the Government alleges, his act to offer RCC, and later Aries, a *quid pro quo* deal: Sandlin property for future legislation—nothing more, nothing less. To prove these charges, the Government need only introduce evidence of Renzi's promise to support legislation and the circumstances surrounding that promise—the "meetings" and "negotiations" with RCC and Aries in which he pitched his offer. *Brewster*, 408 U.S. at 526 ("To make a prima facie case under this indictment, the Government need not show any act of appellee subsequent to the corrupt promise for payment, for it is taking the bribe, not performance of the illicit compact, that is a criminal act.").

[20] The now-struck evidence—all of which concerned "the legislative performance itself"—is superfluous to these showings because the indictment could have been returned even absent these exhibits. *Id.* at 525-27 ("An examination of the indictment brought against appellee and the statutes on which it is founded reveals that no inquiry into legislative acts or motivation for legislative acts *is necessary* for the Government to make out a prima facie case." (emphasis added)). Thus, while these exhibits should not have been presented, we cannot conclude that they were "essential elements of proof" that *caused* the jury to indict. *Swindall*, 971 F.2d at 1548; *see also Brewster*, 408 U.S. at 526-27; *Johnson*, 383 U.S. at 185. We therefore have no cause to grant Renzi the relief he seeks.[20]

---

[20]We reject Renzi's claim that this renders the Clause a right without a remedy. The Court dismissed a similar vindication argument in *Calandra*:

　　It should be noted that, even absent the exclusionary rule, a grand jury witness may have other remedies to redress the injury to his privacy and to prevent a further invasion in the future. He may be entitled to maintain a cause of action for damages against the officers who conducted the unlawful search. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S.

We affirm the district court's refusal to grant his dismissal motion.

## C

Finally, we consider Renzi's claim that the district court erred by refusing to hold a *Kastigar*-like hearing to determine whether the Government used evidence protected by the Speech or Debate Clause to obtain non-privileged evidence and whether the Government can prove its case with evidence derived from legitimate independent sources.

What Renzi asks is no small request. Rather, to do as he suggests would require us to agree that there exists some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize. It would require us to ignore the care with which the Court has described the bounds of the Clause and to agree that legislative convenience precludes the Government from reviewing documentary evidence referencing "legislative acts" even as part of an investigation into unprotected activity. *See United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 655-56, 666 (D.C. Cir. 2007). Moreover, it would require us to conclude that this privilege of non-disclosure precludes even the use of derivative evidence.[21] Because we do not think it wise

---

388 (1971). He may also seek return of the illegally seized property, and exclusion of the property and its fruits from being used as evidence against him in a criminal trial. *Go-Bart Importing Co. v. United States*, 282 U.S. 344 (1931). In these circumstances, we cannot say that such a witness is necessarily left remediless in the face of an unlawful search and seizure.

414 U.S. at 354 n.10 (citations amended to comport with modern citation style).

[21]Renzi seems to assume that the Government would be required to prove that the indictment was not obtained through the use of derivative evidence were we to adopt the *Rayburn* formulation. We do not agree.

to expand the Clause "beyond its intended scope, its literal language, and its history" to "make Members of Congress super-citizens," *Brewster*, 408 U.S. at 516, we decline Renzi's request.[22]

Renzi's claim has its genesis—as it must—in the only case that has ever held that the Clause goes so far as to preclude the Executive from obtaining and reviewing "legislative act" evidence: the decision of the D.C. Circuit Court of Appeals in *Rayburn*. 497 F.3d at 659-60 ("Although in *Gravel* the Court held that the Clause embraces a testimonial privilege, [408 U.S.] at 616, to date the Court has not spoken on whether the privilege conferred by the Clause includes a non-disclosure privilege. However, this court has."). *Rayburn* itself concerned a novel problem: the first execution of a search warrant on the congressional office of a sitting Member of

Invoking the term "*Kastigar*-like hearing" does not serve to suspend the general rule that facially valid indictments are not subject to challenge. *Calandra*, 414 U.S. at 345. Rather, *Kastigar* hearings occur only because the immunity privilege implicated therein itself precludes derivative use. *Kastigar*, 406 U.S. at 453 ("We hold that such immunity from use *and derivative use* is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." (emphasis added)).

Even the *Rayburn* privilege does not go that far. 497 F.3d at 664-67 ("Although the search of Congressman Jefferson's paper files violated the Speech or Debate Clause, his argument does not support granting the relief that he seeks, namely the return of all seized documents, including copies, whether privileged or not."); *see Rostenkowski*, 59 F.3d at 1300 (rejecting the suggestion that *Kastigar*-like hearings are appropriate in the Speech or Debate context). As a result, even under *Rayburn*, Renzi would need to rely on the exclusionary rule to preclude a jury's consideration of "fruit" evidence, and, as discussed, that rule has no place in the grand jury context. *Calandra*, 414 U.S. at 354-55.

[22]Renzi argued to the district court that this same privilege also required the disqualification of the prosecution team based on its exposure to protected material. *Cf. Rayburn*, 497 F.3d at 666. In light of our disposition here, we think that argument was properly rejected.

Congress.[23] Not surprisingly, Representative William J. Jefferson, the target of the search, eschewed his new position in the footnotes of history and brought a motion pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure[24] seeking the return of all materials seized by the Executive.

The district court denied Jefferson's motion but a panel of the D.C. Circuit Court of Appeals reversed. *Rayburn*, 497 F.3d at 656-57. Two of the three members of that panel reasoned that circuit precedent had already established that the testimonial privilege of the Clause precluded *civil discovery* of documentary "legislative act" evidence and saw no reason not to extend that rationale to the context of a criminal investigation. *Id.* at 660 ("[O]ur opinion in *Brown & Williamson* makes clear that a key purpose of the privilege is to prevent intrusions in the legislative process and that the legislative process is disrupted by the disclosure of legislative material, regardless of the use to which the disclosed materials are put." (citing *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 419 (D.C. Cir. 1995))). *But see Brown*, 62 F.3d at 419-20 ("*Gravel*'s sensitivities to the existence of criminal proceedings against persons other than Members of Congress at least suggest that the testimonial privilege might be less stringently applied when inconsistent with a sovereign inter-

---

[23]As noted by Judge Karen Henderson, "this unique moment in our nation's history [wa]s largely of the Representative's own making." *Rayburn*, 497 F.3d at 668 n.7 (Henderson, J., concurring). Though it had "probable cause to believe that Congressman Jefferson, acting with other targets of the investigation, had sought and in some cases already accepted financial backing and or concealed payments of cash or equity interests in business ventures located in the United States, Nigeria, and Ghana in exchange for his undertaking official acts as a Congressman while promoting the business interests of himself and the targets," *id.* at 656, the Government first sought for months to obtain Representative Jefferson's cooperation in their investigation, *id.* at 668 n.7 (Henderson, J., concurring). Only after its efforts were rebuffed did the Government obtain the warrant. *Id.*

[24]"A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."

est, but is 'absolute in all other contexts.'"). The majority concluded "that a search that allows agents of the Executive to review privileged materials without the Member's consent violates the Clause" because it serves *to distract* Members and their staffs from their legislative work. *Rayburn*, 497 F.3d at 660, 663. It ordered the return of all privileged materials to Congressman Jefferson, but declined to order the return of non-privileged materials as well. *Id.* at 665 ("[A]bsent any claim of disruption of the congressional office by reason of lack of original versions, it is unnecessary to order the return of non-privileged materials as a further remedy for the violation of the Clause.").[25]

**[21]** Responding to the critique of their concurring colleague, the court dismissed the contention that its construction of the Clause effectively eviscerated the ability of the Executive to investigate Members of Congress. *Compare id.* at 661, *with id.* at 671-72 (Henderson, J., concurring) ("[A]s the government points out, to conclude that the Clause's shield protects against *any* Executive Branch exposure to records of legislative acts would jeopardize law enforcement tools 'that have never been considered problematic.' If Executive Branch exposure alone violated the privilege, 'agents . . . could not conduct a voluntary interview with a congressional staffer who wished to report criminal conduct by a Member or staffer, because of the possibility . . . that the staffer would discuss legislative acts in . . . describing the unprivileged, criminal conduct.' " (internal citations omitted) (alterations in original)). Rather, the majority concluded that nothing barred the Executive from seeking judicial review of a Member's claim that particular documents were privileged from disclosure by the Clause. *Id.* at 662. Specifically, the court referenced with approval its prior order that the district court review all of the seized materials and make findings as to

---

[25]The court also declined to consider "whether the seized evidence must be suppressed under the Fourth Amendment." *Rayburn*, 497 F.3d at 655.

which documents referenced privileged activity. *Compare id.* at 661-62, *with id.* at 657-58.

Simply stated, we cannot agree with our esteemed colleagues on the D.C. Circuit. We disagree with both *Rayburn*'s premise and its effect and thus decline to adopt its rationale.

*Rayburn* rests on the notion that "distraction" of Members and their staffs from their legislative tasks is a principal concern of the Clause, and that distraction *alone* can therefore serve as a touchstone for application of the Clause's testimonial privilege. 497 F.3d at 660 (reasoning that "the touchstone [of the Clause] is interference with legislative activities" (quoting *Brown*, 62 F.3d at 418, 421 (decided in the context of civil discovery))). This formulation of the Clause is specific to the D.C. Circuit, *id.* at 659-60, and was first derived by that court in *MINPECO*, a case concerning civil discovery, 844 F.2d at 859. There, the court relied on a fragment of a single passage of *Eastland* to support its conclusion that the Clause precludes not only civil actions, but also civil discovery of documentary "legislative act" evidence, because both could be equally distracting:

> One of [the Clause's] purposes is to shield legislators from private civil actions that "create[ ] a distraction and force[ ] Members to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Eastland*, 421 U.S. at 503. A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive.

*MINPECO*, 844 F.2d at 859 (internal citation amended to comport with modern citation style) (first alteration added). We do not interpret *Eastland* so broadly.[26]

---

[26]We also think *MINPECO*'s reliance on *Miller* is misplaced. 844 F.2d at 860. *Miller* dealt with a civil litigant's attempt to compel former Con-

To be clear, we have no quarrel with *MINPECO*'s observation that a civil action cannot be maintained against a member of Congress once it is determined that the action is based on a Member's "legislative act." *Id.* That was the primary point of *Eastland*; that the Clause's privilege against liability[27] applies in equal measure to preclude both criminal and civil actions against a Member and his staff that are premised on "legislative acts." 421 U.S. at 503, 512-13. Where we differ with *MINPECO* is in our belief that legislative distraction is not the primary ill the Clause seeks to cure. Rather, we think the entirety of the passage of *Eastland* on which *MINPECO* relies demonstrates that concern for distraction *alone* precludes inquiry *only* when the underlying action is itself precluded:

> Thus we have long held that, when it applies, the Clause provides protection against civil as well as criminal *actions*, and against *actions* brought by private individuals as well as those initiated by the Executive Branch.
>
> The applicability of the Clause to private civil *actions* is supported by the absoluteness of the term 'shall not be questioned,' and the sweep of the term 'in any other Place.' In reading the Clause broadly we have said that legislators acting within the sphere of legitimate legislative activity 'should be protected

---

gressman Sam Steiger *to testify* about acts we considered protected by the Clause. 709 F.2d at 526, 531. We affirmed the district court's denial of the litigant's motion to compel, *id.* at 532, because the Clause unequivocally precludes compelling Members to testify about their "legislative acts." *E.g.*, *Gravel*, 408 U.S. at 622. We went no further.

[27]To reiterate, the Court has identified three distinct privileges in the Clause: a testimonial privilege, an evidentiary privilege, and a privilege against liability. *MINPECO* relied on the testimonial privilege of the Clause. 844 F.2d at 859. *Eastland* dealt with the Clause's privilege against liability. 421 U.S. at 503.

not only from *the consequences of litigation's results*
but also from *the burden of defending themselves*.'
*Dombrowski*, 387 U.S. at 85. Just as a criminal *pros-
ecution* infringes upon the independence which the
Clause is designed to preserve, a private civil *action*,
whether for an injunction or damages, creates a dis-
traction and forces Members to divert their time,
energy, and attention from their legislative tasks to
defend the *litigation*. Private civil *actions* also may
be used to delay and disrupt the legislative function.
Moreover, whether a criminal *action* is instituted by
the Executive Branch, or a civil *action* is brought by
private parties, judicial power is still brought to bear
on Members of Congress and legislative indepen-
dence is imperiled.

*Id.* at 503 (emphasis added); *Dombrowski*, 387 U.S. at 85
(upholding "summary dismissal of *the action* [against the
Member] on the ground that 'the record before the District
Court contained unchallenged facts of a nature and scope suf-
ficient to give [him] an immunity against answerability in
damages' " (emphasis added)).

Anchoring distraction to a precluded action not only satis-
fies the flair of the language used by the Court in *Eastland*,
but also the precise words used in prior cases and "the sense
of those cases, fairly read." *Cf. Brewster*, 408 U.S. at 516
(counseling against relying on "rhetoric and the sweep of the
language used by courts"). In *Gravel*, for example, the Court
explained that neither Senator Gravel nor his aide could be
questioned about their "legislative acts" because the Clause
precluded the very action against them. 408 U.S. at 629 n.18.
The Court went on to explain, though, that the Clause would
not apply with the same tenacity were the underlying action
not barred:

    Having established that neither the Senator nor
    Rodberg is subject to liability for what occurred at

the subcommittee hearing, we perceive no basis for inquiry of either Rodberg or third parties on this subject. . . . We do not intend to imply, however, that in no grand jury investigations or criminal trials of third parties may third-party witnesses be interrogated about legislative acts of Members of Congress. As for inquiry of Rodberg about third-party crimes, we are quite sure that the District Court has ample power to keep the grand jury proceedings within proper bounds and to foreclose improvident harassment and fishing expeditions into the affairs of a Member of Congress that are no proper concern of the grand jury or the Executive Branch.

*Id*. If distraction alone serves as the touchstone for the absolute protection of the Clause, the distinction drawn by the Court would be quite arbitrary. The quoted passage makes perfect sense, though, if one accepts that an underlying action must be precluded before concern for distraction alone is sufficient to foreclose inquiry.

Anchoring the two concerns also makes practical sense. When the Clause bars the underlying action, any investigation and litigation serve only as wasted exercises that *unnecessarily* distract Members from their legislative tasks. *Eastland*, 421 U.S. at 503, 512-13; *cf. Helstoski*, 442 U.S. at 480-81, 488 n.7; *Gravel*, 408 U.S. at 629 n.18; *Johnson*, 383 U.S. at 173-77. They work only as tools by which the Executive and Judiciary might harass their Legislative brother.

When the underlying action is not precluded by the Clause, however, the calculus is much different. *E.g.*, *Gravel*, 408 U.S. at 629 n.18; *see Brewster*, 408 U.S. at 524-25. In that circumstance, the Court has demonstrated that other legitimate interests exist, most notably the ability of the Executive to adequately investigate and prosecute corrupt legislators for non-protected activity. *Helstoski*, 442 U.S. at 488 n.7; *Brewster*, 408 U.S. at 524-25. As explained by the Court, this inter-

est is of paramount importance to the Legislative branch itself:

> As we noted at the outset, the purpose of the Speech or Debate Clause is to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process. But financial abuses by way of bribes, perhaps even more than Executive power, would gravely undermine legislative integrity and defeat the right of the public to honest representation. *Depriving the Executive of the power to investigate and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence.* Given the disinclination and limitations of each House to police these matters, it is understandable that both Houses deliberately delegated this function to the courts, as they did with the power to punish persons committing contempts of Congress.

*Brewster*, 408 U.S. at 524-25 (emphasis added) (citation omitted). Were we to join the D.C. Circuit in precluding review of any documentary "legislative act" evidence, even as part of an investigation into unprotected activity, for fear of distracting Members, we would thus only harm legislative independence. *Id.*

Moreover, in resolving any lingering uncertainty as to whether distraction alone can preclude disclosure of documentary "legislative act" evidence, we cannot ignore the example of the Court. The Court's own jurisprudence demonstrates that Members have been distracted by investigations and litigation—and have even been compelled to disclose documentary "legislative act" evidence—in cases in which the underlying action was *not* precluded by the Clause. *E.g.*, *Helstoski*, 442 U.S. at 480-81, 488 n.7; *Johnson*, 383 U.S. at 173-77 (describing the Government's investigation into actual

legislation and other clear legislative acts); *see Gravel*, 408 U.S. at 629 n.18. *Helstoski* is particularly insightful. There, the Court described how Congressman Helstoski was compelled to turn over "files on numerous private bills" and "correspondence with a former legislative aide and with individuals for whom bills were introduced." 442 U.S. at 481. Nevertheless, the Court never said a word about the compelled disclosure or the Government's review of that evidence. *Id.* at 488-90. Rather, the Court made clear that the Executive could *use* that documentary evidence against Helstoski at trial so long as it was appropriately redacted:

> Mr. Justice STEVENS suggests that our holding is broader than the Speech or Debate Clause requires. In his view, "it is illogical to adopt rules of evidence that will allow a Member of Congress effectively to immunize himself from conviction simply by inserting references to past legislative acts in all communications, thus rendering all such evidence inadmissible." *Post*, at 2444. Nothing in our opinion, by any conceivable reading, prohibits excising references to legislative acts, so that the remainder of the evidence would be admissible. This is a familiar process in the admission of documentary evidence. Of course, a Member can use the Speech or Debate Clause as a shield against prosecution by the Executive Branch, but only for utterances within the scope of legislative acts as defined in our holdings. That is the clear purpose of the Clause.

*Id.* at 488 n.7. Because the Executive would be hard pressed to redact a document it was constitutionally precluded from obtaining or reviewing, we see no tenable explanation for this caveat except that the Clause does not blindly preclude disclosure and review by the Executive of documentary "legislative act" evidence. Concern for distraction alone cannot bar dis-

closure and review when it takes place as part of an investigation into otherwise unprotected activity.[28]

Having discussed our disagreement with *Rayburn*'s premise, we further explain why we are ill at ease with its effect. For one, it stands in direct contradiction to the Court's directive and example in *Helstoski*. 442 U.S. at 481-82, 488-90. Furthermore, we must bear in mind the Speech or Debate Clause is a creature born of separation of powers concerns. *E.g.*, *Johnson*, 383 U.S. at 178-79,[29] 181-82. As a result, it

---

[28]Of course, it is entirely true that sometimes the very disclosure of documentary evidence in response to a subpoena duces tecum may have some testimonial import. *Rayburn*, 497 F.3d at 669 (Henderson, J., concurring). This was the point raised by Judge Henderson in her concurrence. *Id.* She noted, however, that service of a warrant does not require a property owner "to respond either orally or by physically producing the property, including records." *Id.*; *see Andresen v. Maryland*, 427 U.S. 463, 473 (1976) (" 'A party is privileged from producing the evidence but not from its production.' " (quoting *Johnson v. United States*, 228 U.S. 457, 458 (1913) (Holmes, J.))). As a result, it "falls far short of the 'question[ing]' " required to trigger the Clause. *Rayburn*, 497 F.3d at 669.

[29]As Justice Harlan explained in *Johnson*:

In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders. As Madison noted in Federalist No. 48:

'It is agreed on all sides, that the powers properly belonging to one of the departments, ought not to be directly and comple[te]ly administered by either of the other departments. It is equally evident, that neither of them ought to possess directly or indirectly, an overruling influence over the others in the administration of their respective powers. It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it. After discriminating therefore in theory, the several classes of power, as they may in their nature be legislative, executive, or judiciary; the next and most difficult task, is to provide some practical security for each against the invasion of the others. What this security ought to be, is the great problem to be solved.' (Cooke ed.)

applies in equal scope and with equal strength to both the Executive and the Judiciary:

> It was not only fear of the executive that caused concern in Parliament *but of the judiciary as well, for the judges were often lackeys of the Stuart monarchs, levying punishment more 'to the wishes of the crown than to the gravity of the offence.'* There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause.

*Id.* at 181-82 (emphasis added); *id.* at 178-79.

Despite acknowledging that fact, 497 F.3d at 660, the *Rayburn* court treated the two branches in a remarkably different fashion—concluding that "any Executive Branch exposure to records of legislative acts" was prohibited by the Clause, *id.* at 671 (Henderson, J., concurring), while noting that the Judiciary could review evidence claimed to be privileged, *id.* at 658, 661. Given the Clause's rationale, such a distinction cannot exist. If the Clause applies, it applies absolutely—there is no balancing of interests nor any lessening of the protection afforded depending on the branch that perpetrates the intrusion. *Eastland*, 421 U.S. at 509-10 ("Finally, respondents argue that the purpose of the subpoena was to 'harass, chill, punish and deter' them in the exercise of their First Amend-

---

The legislative privilege, *protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary*, is one manifestation of the 'practical security' for ensuring the independence of the legislature.

383 U.S. at 178-79 (emphasis added).

ment rights, App. 16, and thus that the subpoena cannot be protected by the Clause . . . . *That approach, however, ignores the absolute nature of the speech or debate protection* and our cases which have broadly construed that protection." (emphasis added) (footnote omitted); *id.* at 509 n.16 ("Where we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, *balancing plays no part. The speech or debate protection provides an absolute immunity from judicial interference*." (emphasis added)). If disclosure to the Executive violates the privilege, then disclosure to the Judiciary does no different; the Clause does not distinguish between judge, jury, and prosecutor. *E.g.*, *Johnson*, 383 U.S. at 178-79, 181-82.

As such, the example of the Court again demonstrates that the Clause cannot incorporate the privilege *Rayburn* contends. Many times, the Court has itself reviewed evidence to ascertain whether it was protected or not. *E.g.*, *Helstoski*, 442 U.S. at 487-90; *Johnson*, 383 U.S. at 185-86; *cf. Gravel*, 408 U.S. at 627-29. Were the Clause truly to incorporate a nondisclosure privilege, each of these disclosures would serve as an independent violation of the Clause. We decline to adopt a rationale that would require such a conclusion.

**[22]** In sum, the very fact that the Court has reviewed "legislative act" evidence on countless occasions—and considered cases in which such evidence had been disclosed to the Executive with nary an eyebrow raised as to the disclosure—demonstrates that the Clause does not incorporate a nondisclosure privilege as to any branch. *See, e.g.*, *Helstoski*, 442 U.S. at 480-81, 487-90; *Johnson*, 383 U.S. at 173-77, 185-86. Quite simply, the Court has not left unrecognized a privilege far broader than those narrowly drawn limits it has taken care to articulate. We decline to adopt the D.C. Circuit's *Rayburn* formulation and thus see no cause for a *Kastigar*-like hearing. We again affirm the district court.

**IV**

In its narrowest scope, the Clause is a very large, albeit essential, grant of privilege" that "has enabled reckless men to slander and even destroy others with impunity . . . ." *Brewster*, 408 U.S. at 516. Nevertheless, it has its limits. *McMillan*, 412 U.S. at 313 ("Our cases make perfectly apparent, however, that everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause."). Despite Renzi's best efforts to convince us otherwise, we agree with the district court that the alleged choices and actions for which he is being prosecuted lie beyond those limits. We affirm the district court's denial of relief on each of the issues properly raised on appeal.

**AFFIRMED in part; DISMISSED in part.**